[S.F. No. 24967. Nov. 13, 1986.]

FRANK McCOY et al., Plaintiffs and Respondents, v.
HEARST CORPORATION et al., Defendants and Appellants.

COUNSEL

Pillsbury, Madison & Sutro, Walter R. Allan, Jerome C. Dougherty, Kevin M. Fong, Michael J. Bettinger, E. Jones Kleines, Kleines & Getchell, Kleines, Ballati & Getchell, Arthur Brunwasser, Margaret C. Crosby, Alan L. Schlosser, Edward M. Chen, Arthur B. Hanson and Hanson, O'Brien, Birney & Butler for Defendants and Appellants.

W. Terry Maguire, Richard M. Schmidt, Cohn & Marks, Kirk B. Freeman, Crosby, Heafey, Roach & May, Peter W. Davis, John E. Carne, Judith R. Epstein, Kotler & Kotler, Jonathan Kotler, Gibson, Dunn & Crutcher, Robert S. Warren, Rex S. Heinke, Kelli L. Sager, Gary B. Pruitt, Mullen & Stabile and Gary D. Stabile as Amici Curiae on behalf of Defendants and Appellants.

Charles O. Morgan, Jr., for Plaintiffs and Respondents.

## OPINION

**BIRD, C. J.**—Do the First Amendment to the United States Constitution and California Constitution article I, section 2, protect two reporters and a newspaper against a libel judgment when they obtained and published a prisoner's affidavit containing allegations of official misconduct on the part of two police inspectors and a prosecutor?

### I.

A suit for libel was brought against the Hearst Corporation, which owns the San Francisco Examiner (hereafter Examiner), and two reporters, Raul Ramirez and Lowell Bergman, by respondents, San Francisco Police Inspectors Frank McCoy and Edward Erdelatz, Jr., and former Assistant District Attorney Pierre Merle. The jury returned a verdict in favor of respondents in the sum of $4,560,000. The Court of Appeal affirmed the judgment.

Respondents complained they were libeled by a series of articles published in the Examiner on May 19, 20 and 21, 1976, written by Raul Ramirez with the assistance of Lowell Bergman. The articles purported to expose the wrongful conviction of Richard Lee for the 1972 San Francisco Chinatown killing of Poole Leong. According to the Examiner, Lee's conviction was obtained as a result of respondents' misconduct involving the state's key witness, Thomas Porter.[1]

The centerpiece of the articles, and the basis of respondents' libel claim, was the affidavit of Thomas Porter. This affidavit was reprinted in part in the last article and mentioned in the two previous articles. Porter, Richard Lee's cellmate prior to trial, originally testified at Lee's trial that Lee had confessed the Leong killing to him. However, the Examiner reported that Porter had not only declared this testimony false in a sworn affidavit, but also had charged that respondents procured his trial testimony by threats,

---

[1]The articles are appended hereto as Appendices A through C.

coercion, physical assault and promises of leniency. Porter additionally alleged that respondent Merle, who prosecuted the Lee case, provided him with a written story which he memorized with Merle's help and delivered as testimony at the Lee trial.

The article of May 21st also claimed that a State Bar panel had recommended sanctions be taken against respondent Merle for "alleged misconduct" in relation to another Chinatown case.

Shortly after the articles appeared, Attorney Roger Ruffin filed a petition for writ of habeas corpus in superior court on behalf of Richard Lee. The petition alleged that Lee was innocent and that his conviction was based on false and unreliable evidence. Porter's affidavit[2] was attached as an exhibit in support of the petition, along with declarations from two eyewitnesses to the Leong killing, May Tom and Weyman Tso.

In response to the habeas corpus petition, investigators from the Attorney General's office located Porter in a halfway house in Wichita, Kansas, and obtained a second affidavit from him on July 22, 1976. In this affidavit, Porter attested that his previous affidavit was false. He signed it, he said, because he was upset at the treatment he had received from the California parole board. Porter denied he had been threatened or forced by anyone to give testimony at the Lee trial, or that any promises had been made to him in exchange for that testimony.

## II.

■ In the landmark decision of *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], the Supreme Court held that a public official may not recover damages for a defamatory falsehood relating to official conduct unless it is proved "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (*Id.,* at pp. 279-280 [11 L.Ed.2d at p. 706].)[3] The high court further declared that in order to ensure that the libel judgment does not run afoul of constitutional principles, it must *independently examine* the statements in issue and the circumstances under which they were made against the backdrop of the whole record. (*Id.,* at p. 285 [11 L.Ed.2d at p. 709].)

---

[2]The full text of Porter's affidavit is appended hereto as Appendix D.

[3]Respondents concede they are public officials within the *New York Times* rule. (See *Gomes* v. *Fried* (1982) 136 Cal.App.3d 924, 932-934 [186 Cal.Rptr. 605] [police officers are "public officials"]; *Rosenblatt* v. *Baer* (1966) 383 U.S. 75, 85 [15 L.Ed.2d 597, 605, 86 S.Ct. 669] [". . . 'public official' designation applies at the very least to those . . . government employees who have . . . substantial responsibility for or control over the conduct of governmental affairs. (Fn. omitted.)"].)

Recently, in *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485 [80 L.Ed.2d 502, 104 S.Ct. 1949], the court strongly reaffirmed the principle of independent review. "The requirement of independent appellate review reiterated in *New York Times Co.* v. *Sullivan* is a rule of federal constitutional law. . . . It reflects a deeply held conviction that judges—and particularly Members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection *is not merely a question for the trier of fact.* Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" (*Id.,* at pp. 510-511 [80 L.Ed.2d at p. 523], italics added.)

*Bose* makes plain that in cases involving the constitutional rule of *New York Times,* those facts that are germane to the central question of actual malice must be sorted out and reviewed de novo, independently of any previous determinations by the trier of fact. (*Bose, supra,* 466 U.S. at pp. 505-514 [80 L.Ed.2d at pp. 519-526].) "'The simple fact is that First Amendment questions of "constitutional fact" compel this Court's de novo review. [Citations.]'" (*Id.,* at p. 509, fn. 27 [80 L.Ed.2d at p. 522], quoting *Rosenbloom* v. *Metromedia* (1971) 403 U.S. 29, 54 [29 L.Ed.2d 296, 318, 91 S.Ct. 1811] (plur. opn. of Brennan, J.); accord *Frankson* v. *Design Space Intern.* (Minn.App. 1986) 380 N.W.2d 560, 570 (conc. opn. of Foley, J.) [*Bose* gives appellate court power to conduct de novo review]; *Thompson* v. *Thompson* (1986) 110 Idaho 93 [714 P.2d 62, 64] [citing *Bose* for the proposition that constitutionally protected interests such as freedom of speech require appellate courts to conduct "free review" of constitutional facts].) Thus, this court must make an independent assessment of the entire record, but only as it pertains to actual malice. Issues apart from this constitutional question need not be reviewed de novo and are subject to the usual rules of appellate review. (*Bose, supra,* 466 U.S. at p. 514, fn. 31 [80 L.Ed.2d at p. 526].)

*Bose* involved an allegedly libelous article in Consumer Reports critiquing the sound path of the Bose 901 loudspeaker system. The article asserted that the sound tended to wander "about the room." (*Bose, supra,* 466 U.S. at pp. 487-488 [80 L.Ed.2d at p. 509].) The federal district court as trier of fact found that this phrase was a false and disparaging statement of fact since the listeners in the sound test, which was the basis of the article, reported instead that there was sound movement "along the wall" between the two speakers. (*Id.,* at pp. 490-491, 494 [80 L.Ed.2d at pp. 510, 513].)

Engineer Arnold Seligson, a Consumers Union employee, supervised the listeners' sound test and interpreted its results in an in-house report. The district court found Seligson's report to be the source of actual malice. In its written findings, the court evaluated Seligson's credibility as a witness and his state of mind when he wrote the report. It concluded that Seligson had knowingly reported a false statement about the speakers' sound movement and, therefore, wrote with actual malice. In making this determination, the district court flatly rejected Seligson's testimony that the two phrases "about the room" and "along the wall" meant about the same thing and expressly found that Seligson's testimony to this effect was not credible. (*Bose, supra,* 466 U.S. at pp. 494-497 [80 L.Ed.2d at pp. 512-514].)

The court of appeals reversed on the ground that the record could not sustain a finding of actual malice. The court ruled that it must review the actual malice determination de novo and that it was not restricted by the "clearly erroneous" standard of rule 52(a) of the Federal Rules of Civil Procedure (hereafter rule 52(a)). (See *Bose, supra,* 466 U.S. at pp. 491-492 [80 L.Ed.2d at pp. 510-511].) That rule mandates that factual findings shall not be set aside unless "clearly erroneous," and that due regard be given to the opportunity of the trial court to evaluate witness credibility.

The case presented the Supreme Court with an apparent conflict between the *New York Times* rule of independent appellate review and rule 52(a). (*Bose, supra,* 466 U.S. at pp. 498-499 [80 L.Ed.2d at p. 515].) The *Bose* court observed that in *New York Times,* in the parallel context of review of state jury verdicts, it had rejected a similar contention by the plaintiff there that the Seventh Amendment[4] precluded independent review of a state jury verdict. (*Id.,* at pp. 508-509, fn. 27 [80 L.Ed.2d at p. 522].)

"Recognizing that the Seventh Amendment's ban on reexamination of facts tried by a jury applied to a case coming from the state courts [citations], we found the argument without merit . . .[;] review of findings of fact is appropriate 'where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts.'" (*Ibid.*)

The high court held that notwithstanding rule 52(a), such a de novo review of "constitutional facts," i.e., facts underlying the finding of actual malice, was necessary to cases arising from bench trials in district court as well. (*Bose, supra,* 466 U.S. at pp. 498-499, 510-511, 514 [80 L.Ed.2d at

---

[4]The Seventh Amendment to the United States Constitution states in part that "no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law."

pp. 515, 523, 525-526].) In so doing, it reiterated the holding of *New York Times* that reviewing courts are obligated to test the actual malice determination against the guaranties of the First and Fourteenth Amendments by making "'an independent constitutional judgment on the facts of the case.'" (*Id.*, at pp. 508-509, fn. 27 [80 L.Ed.2d at p. 522]; *New York Times, supra,* 376 U.S. at p. 285 [11 L.Ed.2d at p. 709].)[5]

The court stressed that there are some issues which, even though largely factual in nature, entail stakes of such constitutional magnitude that they may not be entrusted "finally to the judgment of the trier of fact." (*Id.*, at p. 501, fn. 17 [80 L.Ed.2d at p. 517]; see also pp. 504-510 [80 L.Ed.2d at pp. 518-523] [discussing other types of First Amendment cases in which the factfinder's interpretation of the evidence is subject to independent appellate reevaluation].)[6]

Indeed, in *Bose* the court specifically *rejected* the inferences drawn by the district court regarding Seligson's testimony on the issue of actual malice including the finding that his testimony on this issue was not credible. According to *Bose*, rather than realizing his statement was inaccurate at the time he wrote it, Seligson suffered simply from a "misconception" that "about the room" was the same as "along the wall." (*Bose, supra,* 466 U.S. at pp. 512-513 [80 L.Ed.2d at pp. 524-525].)

The district court's conclusion that Seligson's testimony, "I know what I heard," indicated that he must have realized the statement was false when

[5]*Bose* rejected any suggestion that the duty of independent review is affected by the length or complexity of the trial, or the amount of oral testimony versus documentary evidence adduced. (466 U.S. at pp. 500-501 [80 L.Ed.2d at p. 516].)

[6]Despite their differences with the majority over the role of rule 52(a)'s clearly erroneous standard, the dissenting justices in *Bose* themselves distinguished the federal bench verdict from the state court jury verdict. Cases which come to the reviewing court from a state court after a jury trial "present[] the strongest case for independent factfinding" by the appellate courts. (*Bose, supra,* 466 U.S. at p. 518, fn. 2 [80 L.Ed.2d at p. 528] (dis. opn. of Rehnquist, J.).)

Justice Rehnquist's dissenting opinion in *Bose* observed that it is much easier to justify independent review of jury-found facts due to the inherent vagueness of a general jury verdict and the extremely narrow latitude allowed appellate courts at common law to review such verdicts. (*Ibid.*)

In a similar vein, this court agrees with amici curiae, American Society of Newspaper Editors and American Newspaper Publishers Association, that *Bose* supports the proposition that the de novo rule of review applies with special force to jury verdicts. There is a greater danger that the jury will ignore the limits of the First Amendment, find for the plaintiff out of sympathy, or find against the defendant out of hostility to speech that ought to be protected. (See *Ollman* v. *Evans* (D.C.Cir. 1984) 750 F.2d 970, 1006 (conc. opn. of Bork, J.), cert. den. (1985) 471 U.S. 1127 [86 L.Ed.2d 278, 105 S.Ct. 2662]; see *Bose, supra,* 466 U.S. at p. 518, fn. 2 [80 L.Ed.2d at p. 528] (dis. opn. by Rehnquist, J.).) "[T]he Supreme Court has told us (most recently in [*Bose*]) to be assiduous in protecting the press, even in its least worthy manifestations, from the fury of outraged juries." (*Douglass* v. *Hustler Magazine, Inc.* (7th Cir. 1985) 769 F.2d 1128, 1142.)

he wrote it was deemed inappropriate. "'Analysis of this kind may be adequate when the alleged libel purports to be an . . . account *of events that speak for themselves.*' [Citations.] Here, however, adoption of the language chosen was 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' . . . ." (*Bose, supra,* 466 U.S. at p. 512 [80 L.Ed.2d at pp. 524-525], italics in original.)

The high court also noted the existence of the normal rule that testimony disbelieved by the trier of fact "is not considered a sufficient basis for drawing a contrary conclusion." (*Bose, supra,* 466 U.S. at p. 512 [80 L.Ed.2d at p. 524].) However, it went on to suspend application of this rule to the actual malice context by salvaging Seligson's discredited testimony from the heap of disbelief and reinterpreting its constitutional import.

"In this case the trial judge found it impossible to believe that Seligson continued to maintain that the word 'about' meant 'across.' Seligson's testimony [however] does not constitute clear and convincing evidence of actual malice. Seligson displayed a capacity for rationalization. He had made a mistake and when confronted with it he refused to admit it and steadfastly attempted to maintain that no mistake had been made—that the inaccurate was accurate. That attempt failed, but the fact that he made the attempt does not establish that he realized the inaccuracy at the time of the publication." (*Ibid.*)

Both the principles announced in *Bose* and the manner in which the high court carried out its function of independent review, are the guide to be followed in reviewing the evidence at hand.

■ First, this court must independently review all the evidence presented on the issue of actual malice. It may not restrict itself, as the Court of Appeal did, to evidence favorable to the judgment. By its repeated emphasis that a *New York Times* review includes the *whole* record on actual malice, the high court has made it unmistakably clear that it is constitutionally inadequate to review only those portions of the record that support the verdict. (See *Bose, supra,* 466 U.S. at pp. 508-509 and fn. 27 [80 L.Ed.2d at pp. 521-523]; *Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 282 [41 L.Ed.2d 745, 760-761, 94 S.Ct. 2770]; *Beckley Newspapers* v. *Hanks* (1967) 389 U.S. 81, 82 [19 L.Ed.2d 248, 250, 88 S.Ct. 197]; *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at p. 285 [11 L.Ed.2d at p. 709].)

Additionally, our independent assessment may in some cases involve review of evidence which, like Seligson's testimony in *Bose,* would be considered "discredited" under usual rules of appellate review by virtue of

the jury verdict in favor of respondents. (See *Bose, supra,* 466 U.S. at p. 512 [80 L.Ed.2d at p. 524].)

Second, the execution of this "constitutional responsibility . . . cannot be delegated to the trier of fact" (*Bose, supra,* 466 U.S. at p. 501 [80 L.Ed.2d at p. 516]), and requires this court to step beyond the usual confines of appellate review. Normal principles of substantial evidence review do not apply to the appellate court's independent review of an actual malice determination in a First Amendment libel case.[7]

This court is not bound to consider the evidence of actual malice in the light most favorable to respondents or to draw all permissible inferences in favor of respondents. To do so would compromise the independence of our inquiry. "[T]he constitutional responsibility of independent review encompasses far more than [an] exercise in ritualistic inference granting." (*Tavoulareas* v. *Piro* (D.C.Cir. 1985) 759 F.2d 90, 147 (dis. opn. of J. Skelly Wright, J.), rehg. en banc granted, 763 F.2d 1472, 1481.)

Finally, if warranted, this court may do as the *Bose* court did with Seligson's testimony and substitute its own inferences on the issue of actual malice for those drawn by the trier of fact.[8] This court must independently determine the constitutional import of any particular witness's testimony as it relates to the question of actual malice. (See *Miller* v. *Fenton* (1985) 474 U.S. 104 [88 L.Ed.2d 405; 106 S.Ct. 445].)[9]

---

[7]Our court is not subject to the "clearly erroneous" standard of rule 52(a). However, the standard of review that rule prescribes is similar to the doctrine which restricts the power of our appellate courts to a determination whether there is any substantial evidence, contradicted or uncontradicted, which supports the verdict. (See *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; 9 Witkin, Cal. Procedure (3d ed. 1985) § 278, pp. 289-291; *Wanless* v. *Rothballer* (1985) 136 Ill.App.3d 321 [483 N.E.2d 899, 902] [rule 52(a) is similar to usual prohibition in civil cases against disturbing the determination of trier of fact unless it is contrary to the manifest weight of the evidence].)

Moreover, *Bose* in effect represents merely an express extension to bench trials of the longstanding requirement of de novo review established in *New York Times* in the context of state jury verdicts. (See Monaghan, *Constitutional Fact Review* (1985) 85 Colum. L.Rev. 229, 230.) Thus, it is clear that, as in the case of rule 52(a), the substantial evidence rule does not prescribe the standard of review in First Amendment libel cases. To the extent that the substantial evidence doctrine conflicts with the rule of independent review in these cases, it must yield. (See *Franklin* v. *Leland Stan. Junior University* (1985) 172 Cal.App.3d 322, 330-333 [218 Cal.Rptr. 228].)

[8]This case is particularly well-suited for independent appellate review since the cornerstone of respondents' libel allegations, Thomas Porter, failed to testify at trial and was presented to the jury solely through the cold record of his deposition testimony.

[9]The Court of Appeal herein relied upon two pre-*Bose* cases, *Widener* v. *Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415, 433 [142 Cal.Rptr. 304], and *Bindrim* v. *Mitchell* (1979) 92 Cal.App.3d 61, 72 [155 Cal.Rptr. 29], for its conclusion that its review of the evidence was not de novo but was circumscribed instead by the substantial evidence rule. To the extent that *Widener* and *Bindrim* suggest that the reviewing court's duty to examine the record in public official defamation cases does not involve a de novo review of the actual malice determination, they are inconsistent with *Bose* and are hereby disapproved.

## III.

The crucial focus of actual malice under *New York Times* is the defendant's attitude, or state of mind, toward the allegedly libelous material published. (*St. Amant* v. *Thompson* (1968) 390 U.S. 727 [20 L.Ed.2d 262, 88 S.Ct. 1323]; *Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 256-259 [208 Cal.Rptr. 137, 690 P.2d 610].) In order to evaluate whether the evidence on this record is constitutionally adequate to support the judgment, it is necessary to set out at some length the complete factual record underlying the actual malice determination. However, this court is mindful that evidence concerning appellants' investigations and discoveries was not introduced for its truth, but only as it related to the state of mind of the appellants.

*Preliminary Investigation by Bergman*

In September of 1974, William Lee, Richard Lee's brother, approached Bergman, a freelance investigative journalist, with a request that he look into the fairness of the trial proceedings in Richard Lee's case. William Lee told Bergman that he felt his brother had not received a fair trial. He was concerned that the outcome of the trial might have been influenced by a report distributed and publicized by the California Department of Justice characterizing Chinese youth gangs as the major organized crime threat in the state. He had attended Richard Lee's trial and told Bergman that in his view, it had been tried on the "theory" that Richard Lee was a gangster and that "putting him away" would begin to solve gang problems in Chinatown.

Bergman initially refused William Lee's request to look into the matter, but eventually agreed to read the trial transcript since he was collecting information at the time on organized crime and Chinatown.

After his review of the transcript, Bergman concluded that there were several irregularities in Lee's case. For example, Bergman observed that respondent Merle had apparently not disclosed the existence of the key state's witness, Porter, until the time of trial. He found Porter's testimony difficult to believe. Bergman noted that during respondent McCoy's testimony in the Lee case, he identified two men in the courtroom audience as Chinatown gang members. Bergman perceived this procedure as "highly unusual" and designed to suggest to the jury that the men were present in order to intimidate May Tom during her testimony. Bergman also noted that when May Tom, the sole eyewitness at trial, was asked if Richard Lee was the person she saw kill Leong, she replied "I guess so."

Bergman made a general assessment that the trial proceedings "didn't look right"; that there might have been a miscarriage of justice. He decided to proceed with a preliminary investigation, to try to locate witnesses and to obtain additional information. His motivation to pursue the case was grounded in his belief that the alienation minority youths like Richard Lee experienced frequently led to unjust treatment from the law: "the way in which justice was meted out to them did not seem . . . to be fair, that it was necessary in some ways to maybe make some effort to rectify that situation."

Bergman subsequently had several conversations with William Lee, who also provided him with a copy of an affidavit he had obtained from Weyman Tso. Tso declared that he was present at the scene of the Leong killing but that Richard Lee, whom he knew well, was neither present nor involved.[10]

Bergman next conducted interviews as part of his preliminary investigation. He spoke with Berkeley City Council member Ying Lee Kelly regarding the relationship between law enforcement and the Asian community in the San Francisco area. She informed him that it was well known that organized crime, gambling and police payoffs occurred in the community. She also told him that Asian groups had sued the California Attorney General for the Department of Justice report which characterized Chinese youth gangs as a major organized crime threat. This was the same report that William Lee had told Bergman about. Bergman believed that the Attorney General had later publicly apologized for the report.

Bergman next spoke with Paul Avery, a 15-year veteran reporter of the San Francisco Chronicle, whose specialty was police reporting. Bergman had read an article by Avery on Merle's prosecution of another Chinatown youth "gang" case involving Joe Fong. Avery told Bergman that a youth named Clifton Wong had, through his attorney, admitted that he committed the crime of which Fong was accused and eventually convicted. Bergman's understanding was that although this exculpatory evidence was available to Merle, he did not reveal it at Fong's trial. Avery informed Bergman that Avery's sources in the San Francisco Police Department had informed him that the police were "after" Fong and intended to "put him away" on any charge possible.

Avery also gave Bergman information concerning May Tom. Avery and another reporter interviewed Tom after the Richard Lee trial. Avery stated

---

[10]Tso had been identified by May Tom on the night of the homicide as the second youth present at the killing. Although he was arrested and released in March of 1973, Tso was apparently never prosecuted in connection with the Leong incident. As noted, Tso's affidavit was attached as an exhibit to the Lee habeas corpus proceeding.

that according to May Tom, Avery was the first person to inform her that she was the only eyewitness at the Lee trial. She told Avery that McCoy had told her there were 11 other "witnesses" in the Lee case. Avery subsequently arranged for Attorney Paul Halvonik to interview Tom. Avery informed Bergman that Tom gave a statement to Halvonik that was similar to the one she gave to Avery. Avery urged Bergman to get involved in the Lee case.

The following week, Bergman interviewed Paul Halvonik. Halvonik told Bergman that he had taken a statement from May Tom in which she expressed her distress about the Lee case: she felt she had been misled by Merle; she stated she had been shouted at by Merle; she indicated that her identification of Lee was not as strong as it appeared. May Tom also told Halvonik that she was extremely upset with Merle because he had given the jury the impression that if her testimony seemed equivocal it was because she had been intimidated by Chinese gang members. In fact, she expressly told Merle that she did not feel intimidated at all. Halvonik further informed Bergman that while he did not feel Tom's statements were strong enough to overturn Lee's conviction, he did think that Lee would not have been convicted had the jury known how unsure she was of her identification.

In January of 1975, Bergman wrote to Porter in federal prison in Indiana. Bergman stated that he was a journalist and researcher investigating the murder trial of Richard Lee and that he wanted to discuss Porter's trial testimony. Bergman alluded to "unorthodox" activities in other cases on the part of the San Francisco police and district attorney. He asked Porter to call him collect if he were interested in discussing what happened during the Lee proceedings.

Shortly thereafter, Porter telephoned Bergman collect. It is *undisputed* that in this first conversation, Porter told Bergman that he had testified falsely at the Lee trial. He told Bergman something had gone on between him and the authorities but that he did not want to go into details because he felt uncomfortable discussing the matter on the telephone. Porter also told Bergman that the authorities had promised him he would not have to return to California to serve more time and that his entire state sentence would be served concurrently with his federal time. For this reason Porter was very concerned about a California detainer lodged against him which would require him to return to California to serve more time after completing his federal sentence.[11]

---

[11]A detainer is a written notice of an unserved sentence or pending charge against a prisoner filed by law enforcement officials with prison authorities. It ensures that the detaining authority is notified and has the opportunity to take custody before the prisoner is released. (Smith & Snedeker, Cal. State Prisoners Handbook (1982) § 8.2, pp. 178-179.)

Bergman did not know what a detainer was at the time, but told Porter he would try to check on Porter's legal status before visiting him in Indiana. Bergman testified that he did not promise Porter anything. Bergman told Porter that whether he would do anything for Porter "depended" on what happened when they met.

Bergman testified that Porter stated he had never done anything like what he did in Lee's trial; it "weighed" on him. In his notes of this telephone conversation, Bergman recorded the message Porter asked him to take to Richard Lee: "Let Richard know 'forgive me' . . . didn't do it because I wanted." Porter testified that in order to get Bergman to help him with the California detainer, he told Bergman he felt badly about lying at Lee's trial.

Porter acknowledged that in this first telephone call Bergman expressed concern about whether Richard Lee had been properly convicted. Other witnesses in the trial were going to change their testimony, Bergman said, and the San Francisco police had "pressured people." Porter took this statement as a "suggestion" that Bergman might want him to recant his testimony.[12] Porter felt that Bergman wanted to hear that Porter had not testified truthfully in the Lee trial and he thought that Bergman would help him if he recanted his trial testimony. Porter was willing to lie to Bergman in order to get help with his detainer. He asked how he could help and Bergman replied that Porter could help by making an affidavit. Porter told Bergman he was willing to meet with him to discuss the matter further.

Prior to visiting Porter, Bergman met with Attorney Charles Garry who was handling Richard Lee's direct appeal. Garry told Bergman that in his opinion Lee's conviction was a "travesty." He felt the defense had been inadequate and the case contained reversible error. Garry believed that Lee was a member of a group that law enforcement officials had singled out to "get" because they believed the group was guilty of certain crimes. Garry also informed Bergman that the prosecution is obligated to disclose to the defense evidence of promises to or recommendations made regarding a witness, so that the jury can adequately assess that witness's credibility.

Around this time, Bergman spoke with Attorney Patrick Hallinan who informed him he had filed a complaint against respondent Merle with the State Bar alleging that Merle had improperly interrogated a witness in another Chinatown case.

---

[12]Porter first testified that Bergman told him during this first conversation that he thought Porter's testimony at the Lee trial was false. However, later, Porter flatly denied that Bergman had made such a statement.

*Development of Bergman's Relationship with Porter*

Bergman visited Porter in prison in January of 1975. Their ensuing interchange is the basis of respondents' contention that Bergman actually knew Porter's allegations against them were false.

Bergman testified that when they met, Porter reiterated that he had lied at Lee's trial due to threats and coercion from respondents and that he had never before done such a thing. He told Bergman he would be willing to testify and to execute a sworn statement to that effect.

Porter testified that Bergman told him he represented Richard Lee and that he had come "to find out about me testifying in the courtroom . . . against Richard Lee." Bergman told Porter he felt that some of the things Porter had testified to were not true. Porter testified Bergman "was wondering" if Porter would be willing "to give another testimony." Porter claimed that when he told Bergman his testimony at the Lee trial was true, Bergman replied that he did not believe it; he thought it was false.

According to Porter, Bergman told him that if he changed his testimony, Richard Lee stood a chance of getting out and Porter would not have to "do that five to life," referring to the California detainer. Porter testified that when Bergman asked him whether McCoy and Erdelatz had threatened him, he said no; but Bergman then asked him again, "like it was—it's not going to work, change of testimony." At that point, Porter changed his story because he felt that Bergman would then help him get released from the detainer.

Porter also testified, however, that Bergman never came right out and told him to say certain things; he just made "suggestions" and used "leading questions." According to Porter, Bergman did not say outright that he wanted him to give an untrue statement; Bergman would not "just come out and say those words, no." Nor did Bergman "just come out and say 'recant your statement.'"

Porter confirmed that he told Bergman he testified falsely at Lee's trial and that it "weighed" on him. He explained that he was angry at respondents and he saw the meeting with Bergman as an opportunity to get back at them. Bergman testified he told Porter that as part of checking into the story, he would probably be checking into the detainer. He denied that he ever

promised Porter any help in exchange for Porter's giving an affidavit and denied that there was any understanding to that effect.[13]

While Bergman had questions about some of the information Porter imparted to him, he also believed much of it could be true. He considered Porter to be taking a considerable risk to his personal safety by stepping forward and making allegations of misconduct against the police and prosecutor. He viewed Porter's willingness to give a sworn statement as an indication that he was telling the truth. His and Ramirez's subsequent investigation and discovery of information relating to the conduct of respondents in other cases increased his feeling that Porter's charges were believable. For these reasons and because of Porter's stated willingness to testify as well, it never occurred to Bergman that he was being conned.

After his interview with Porter, Bergman worked with William Lee in arranging for Indianapolis Attorney John Manning to take Porter's affidavit. Manning met with Porter in February and again in April of 1975. Based on his notes from these interviews, Manning prepared an affidavit which Porter signed in July of 1975. (See Appendix D.) Bergman did not participate in the preparation of the affidavit.[14] Manning testified that at some point before the articles were published, he indicated to Bergman that he had some doubt about Porter's veracity. Bergman testified that Manning commented only about the lack of weight the testimony of Porter, a convict, would have in a legal proceeding.

Between February and June of 1975, Bergman inquired about the status of Porter's detainer, as he indicated he would do, and corresponded with Porter on this issue. Bergman believed there might be a record of any promise made to Porter that he would not have to return to California. Bergman contacted Attorney Bruce Hotchkiss who confirmed that there was a letter in Porter's file reflecting a recommendation from law enforcement officials regarding the detainer. In addition, Bergman was referred through Attorney Halvonik to Alice Lytle in the Governor's office. Bergman contacted Lytle and informed her of Porter's concerns about the detainer. She apparently suggested Porter write to the Governor's office directly; Bergman passed that address on to Porter.

---

[13]Bergman made notes of this interview and later transformed them into a typewritten summary. He noted that ". . . much of the conversation with Porter revolved around his feelings concerning Richard's imprisonment. He asked about Richard's condition and expressed regret." According to Bergman's notes, Porter told him he understood that, in Porter's words, "actions are what count," and that until then, Bergman and others "could promise little help."

[14]In addition to recounting what Porter told Bergman in their interview, the affidavit alleged that when Porter refused to testify as respondents had instructed, McCoy and Erdelatz took him to an elevator near their office where they struck, kicked, and threatened to kill him.

In June, Bergman wrote to Porter regarding Porter's concern that unless the detainer were dropped, he might still be in custody when he returned to California to testify on Lee's behalf in connection with the affidavit. Porter was afraid his life would be in danger under those circumstances. Bergman wrote that ". . . we should be clear about my role: (1) I'm trying to set the record straight and that is my motivation; (2) I can't make promises or go to bat for you in a full scale way until Manning finishes otherwise it will all get very complicated. I thought we had a clear understanding there."

According to Bergman, he wrote this letter to Porter because he needed Porter to step forward with his allegations in a sworn affidavit so there would be documentary proof that a "deal" had been made between Porter and respondents. The "understanding" was that Porter would "go through all the way" and sign the affidavit to make up for the lies he told against Lee. Bergman would then try to protect him as much as he could should Porter have to return to California to testify in the Lee matter.

Bergman felt that unless Porter were willing to step forward with a sworn statement as he had initially indicated he would, the situation would become complicated because Porter would be "put on the spot as to whether or not he had said these things." Bergman testified he was not sure he would have been so concerned about Porter unless Porter had been willing to sign the affidavit. Bergman denied that "going to bat in a full scale way" meant helping on the detainer; instead it referred to those efforts he would make to ensure Porter's safety once he did commit himself in a sworn statement.[15]

*Investigation by Bergman and Ramirez*

In April of 1975, Bergman and William Lee persuaded the Examiner to pursue the Richard Lee story. Appellant Ramirez, a reporter for the Examiner, was assigned to work with Bergman in developing and investigating the story. Bergman's role was to cooperate with Ramirez in the investigation and to maintain contact with Porter. Ramirez's role was to investigate and write the articles. During the following year, Bergman and Ramirez interviewed between 35 and 40 people including attorneys, law enforcement officials, writers and experts on Asian youth and community issues, and friends and associates of Richard Lee. They also reviewed documents on Lee's background and the court files and police records in his and other cases.

---

[15]On August 19, 1975, Alice Lytle informed Porter by letter that the California parole board had authorized the parole board at Terre Haute to handle the parole determination on his state charges, thereby eliminating the necessity of his being returned to California for a parole hearing.

In the course of these efforts, the reporters uncovered several items which *in their minds* directly and indirectly corroborated Porter's allegations. The most significant of these involved perceived misconduct by respondents in the following circumstances.[16]

1. The reporters located a pretrial discovery order in the Lee case requiring the prosecution to furnish the defense with, inter alia, any and all statements, admissions and/or confessions of the accused and any and all statements of people who might be called as prosecution witnesses. They knew from conversations with Lee's trial attorney and from their reading of the trial transcript, that respondent Merle had not disclosed Porter's existence until the first day of trial. They also knew that the trial judge had denied a defense request for a continuance based on the disclosure of surprise witness Porter. Therefore, appellants perceived Merle's failure to disclose Porter's existence as an indication of misconduct, as corroborative of Porter's misconduct allegations, and as further support for their theory that Lee was denied a fair trial.[17]

2. The reporters learned that after trial and before sentencing, without notifying Lee's counsel, McCoy and Erdelatz brought Lee to the homicide bureau for questioning about another case. McCoy later informed the probation department that during this interrogation, Lee had "confirmed" that the evidence presented at his trial was correct. Lee, however, told Ramirez this was untrue. The reporters argued that the conduct of McCoy and Erdelatz in speaking to Lee before sentencing and without counsel was improper and that it was highly improbable that Lee had discussed his case.[18]

3. Porter steadfastly maintained he had been "promised" certain benefits for his trial testimony in the Lee case.[19] The reporters checked with attorneys and reviewed records which indicated to them that some type of arrangement had in fact been made between Porter and one or more of respondents in exchange for Porter's testimony. The removal of Porter's detainer by the parole board in late 1975 superficially corroborated Porter's claim that he

---

[16]It should be emphasized that whether any misconduct occurred is irrelevant to resolution of the issue of appellants' subjective state of mind. Instead, it is appellants' subjective attitude toward the information they discovered which properly bears on the issue of actual malice.

[17]Merle testified that he did not reveal Porter's existence until the first day of trial because he did not believe the discovery order included confidential informants such as Porter.

[18]Erdelatz testified that Lee did not say much during this posttrial interrogation, but just nodded his head affirmatively in response to questioning by McCoy.

[19]Porter continued to maintain in this case that before he testified in the Lee case, respondents promised him that his state sentence would be served concurrently with his federal sentence; that his entire sentence would be served in federal institutions; that he would not be returned to California to serve time; and that his crime partner and girlfriend would be released from custody after 90 days observation.

benefited in exchange for his testimony. From the reporters' perspective, respondents acted improperly both by promising Porter benefits for his testimony and by not disclosing the arrangement to the defense.

4. The reporters also learned of formal and informal complaints against respondent Merle in other cases. Attorney Patrick Hallinan gave them a copy of his formal complaint against Merle to the State Bar. Hallinan maintained that Merle had improperly interrogated his client, Dean Tom, despite his knowledge that Tom was represented by counsel. Later, according to Hallinan's charges, Merle had lied in court about the matter.

In addition, Paul Avery informed both reporters that Merle had suppressed exculpatory evidence involving Clifton Wong's confession that he committed the crime for which Merle was prosecuting Joe Fong. Similarly, Dennis Flanders, who worked at the Police Activities League and had testified against Joe Fong, informed Ramirez that he believed Fong had been "framed" and unfairly convicted. Ramirez also read a newspaper story which reported a case in which an attorney was cited for contempt of court for having told Merle, a witness in the case, to "crawl down from the witness stand."

5. Porter told Bergman that during one of his meetings with Merle, he overheard Merle telephone a United States Army sergeant and suggest that an Asian man be dishonorably discharged in retaliation for failing to co-operate with Merle on a murder case. In the course of their investigation, Bergman and Ramirez obtained a copy of a letter from Merle to Major G.W. Sims memorializing their earlier telephone conversation concerning Johnson Lam, who was apparently under Sims's authority. In the letter, Merle stated that Lam, a victim of a severe beating by a Chinese youth gang, refused to testify and was extremely uncooperative, evasive and angry. Merle characterized Lam as having a "negative attitude towards a serious problem in . . . society as well as a problem of his own people . . . ." The reporters argued that this letter was corroborative of Porter's version of Merle's telephone call.

6. Bergman and Ramirez also had access to a transcript of an interview between Attorney Sandra Terzian and May Tom as well as an affidavit by May Tom prepared by Attorney Roger Ruffin. Therefore, they were aware of Tom's sworn statement that she was unsure of her identification of Lee as Leong's killer and that her attempts to communicate this uncertainty to respondents had been met with anger and misrepresentations about the

importance of her role in the case.[20] Ramirez interviewed May Tom four or five times and had several telephone conversations with her about her testimony in the Lee case.

The reporters attempted to corroborate Porter's story through other channels as well. For example, Ramirez worked with several sheriff's deputies in an unsuccessful effort to locate jail records which might document the many meetings Porter alleged he had with respondents. The department's undersheriff informed Ramirez that record keeping was often intentionally incomplete due to security concerns. As a result, Ramirez did not consider his inability to locate any records on Porter's movement as undercutting Porter's claim that he had met with respondents numerous times.

Bergman and Ramirez also made repeated but unsuccessful efforts to locate three persons—Porter's sister, his crime partner and girlfriend, and a missionary—to whom Porter said he had previously related his allegations about respondents.

Apart from attempting to corroborate Porter's charges against respondents, the reporters gathered information regarding other aspects of the Lee case. For example, they spoke with Lee's attorney, Lee's friends and associates, and with alibi witnesses never called to testify by the defense. They interviewed Weyman Tso several times. Tso reiterated the gist of his sworn affidavit which William Lee had shown Bergman: Tso had witnessed the shooting of Leong and knew that Lee was not involved.

Finally, the reporters contacted several people to gather background information on Chinese "youth gangs" and on the relationship between the Chinatown community and law enforcement.[21]

---

[20]May Tom's affidavit contained additional allegations of misconduct against respondents. She averred that she selected Lee's photograph as the killer because she had seen him in Chinatown in the past and that when McCoy and Erdelatz were showing her photographs she was under the impression she had to keep looking until she picked someone out. She subsequently believed she had made a mistake in her selection of Lee as the killer but when she informed McCoy and/or Erdelatz of this, one of them told her there were 11 other witnesses who had identified Lee as the gunman.

She further declared that she picked Lee at the corporeal lineup because when she told the police she was not sure she could recognize Leong's killer, someone, probably McCoy, told her just to pick out the person whose photograph she had selected earlier. When she told Merle she was uncertain of her identification he became very angry at her. She stated she identified Lee at the preliminary examination even though she did not believe he was the gunman.

[21]They interviewed: Sergeant George Huegle of the San Francisco Police Department Intelligence Unit, an officer familiar with the Chinatown community; Inspector Herb Lee of the San Francisco Police Department Juvenile Detail, who was familiar with Chinatown youth; Inspector Diarmuid Philpott, a specialist on Chinatown and Chinatown youth; Officers Terry Sullivan and Dennis Flanders of the San Francisco Police Activities League; Officer

*Ramirez and the State Bar Allegations Involving Merle*

During the course of appellants' investigation, Attorney Patrick Hallinan provided Ramirez with a copy of the letter he had filed against Merle with the State Bar of California. As noted, this letter charged that despite Merle's knowledge that Hallinan represented Dean Tom, Merle had improperly interrogated Tom without counsel. Hallinan also told Ramirez that it was his understanding there had been a recommendation within the bar that Merle be disciplined on the Tom matter.

Several months later, Ramirez checked with Hallinan again about the status of the Merle complaint. Hallinan told Ramirez that a full committee of the bar had reversed a panel's earlier recommendation that Merle be disciplined. Ramirez was also informed by someone at the State Bar that as a matter of policy the bar did not release information about pending complaints.

In the article of May 21, 1976, Ramirez wrote that a State Bar disciplinary review committee had decided to sanction Merle for his alleged misconduct in a 1973 Chinatown case. Ramirez added that according to State Bar officials, no official action had been taken. Ramirez's original draft of this article stated that a bar panel had recommended that Merle be sanctioned for alleged misconduct, but that "a larger committee overturned this suggestion." Ramirez testified that after he wrote this draft, but prior to publication, he received "additional information" that caused him to change the story to its final version, omitting any reference to the fact that the recommendation to impose sanctions had been overturned. He further testified that when he submitted that final version for publication, he believed it was accurate.

Leon Getchell of the San Francisco Police Department Narcotics Division; Officer Fred Lau of the San Francisco Police Department Community Relations Unit; Inspector Art Fobbs of the Juvenile Bureau of the San Francisco Police Department; Captain James Curran of the San Francisco central police station; Officer Art Tappia of the San Francisco Police Department and a board member of Chinese Youth Alternatives; Wayne Yee and Ron Albers of Chinese Youth Alternatives; Atea Koon, director of the Youth Service Center in Chinatown; Donald Wong, staff member with Chinese for Affirmative Action; Jack Woo, president of the Chinese Six Companies; Rose Pak, a San Francisco Chronicle correspondent; George Woo, a professor of Asian American studies at San Francisco State University; Al Martinez, a reporter for the Los Angeles Times, who had written a story about Chinese youth violence; Cynthia Gurney, a reporter for the Washington Post, who was preparing a story on Chinatown youth crime; Jennifer Thompson, who was preparing to write a story about Richard Lee and Joe Fong for San Francisco Magazine; Reverend Gordon MacLain, executive director of Youth for Christ in Santa Clara County, who had written about youth in Chinatown and youth and delinquency in other communities and had visited Joe Fong in prison; Gary Pang, a friend of Richard Lee and Joe Fong; Ben Fong Torres, the brother of Barry Fong Torres, who was killed the night Joe Fong and Richard Lee were arrested; and Joe Fong.

## IV.

This case presents "the delicate and sensitive task of accommodating the First Amendment's protection of free expression of ideas with the common law's protection of an individual's interest in reputation." (*Ollman* v. *Evans, supra,* 750 F.2d at p. 974.) Libel laws recognize that each person has a right not to be disparaged by false statements. (Eldredge, The Law of Defamation (1978) § 4, p. 8.)[22] Society's interest in redressing the harm done to one's reputation is strong. (*Rosenblatt* v. *Baer, supra,* 383 U.S. at p. 86 [15 L.Ed.2d at pp. 605-606].) Moreover, this court is not unmindful that "[t]he harm done to one's reputation by erroneous charges of corruption or dishonesty can never be fully undone, . . . For even an erased question mark still suffices to raise the question, where perhaps none existed before." (Bird, *The Role of the Press in a First Amendment Society* (1980) 20 Santa Clara L.Rev. 1, 8 [hereafter *Role of the Press*].)

There exists a substantial tension between the protection of these reputational interests and the commitment to free debate. (See *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 342 [41 L.Ed.2d 789, 806-807, 94 S.Ct. 2997].) Few events place this tension in such graphic relief as when false accusations of corruption are disseminated in an irresponsible and gratuitous fashion by an indifferent and powerful press.

Nevertheless, press responsibility is not constitutionally mandated nor can it be legislatively or judicially compelled. (See *Miami Herald Publishing Co.* v. *Tornillo* (1974) 418 U.S. 241, 256 [41 L.Ed.2d 730, 740, 94 S.Ct. 2831].) The First Amendment grants the press a privilege to report and comment upon official actions with no requirement that an individual's reputation be spared. (*Rosenbloom* v. *Metromedia, supra,* 403 U.S. 29, 62 [29 L.Ed.2d 296, 322], conc. opn. of White, J.) As this court recently observed: "Fair and objective reporting may be a worthy ideal, but there is also room, within the protection of the First Amendment, for writing which seeks to expose wrongdoing and arouse righteous anger . . . ." (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 259.)

The constitutional protections afforded the media under *New York Times* present a formidable barrier to public official plaintiffs. Equally formidable, however, are those principles which prompted the high court's articulation of the concept of constitutional malice.

---

[22]"'Good character, or reputation, consists of the general opinion of people respecting one. It is built up by a lifetime of conduct. It is probably the dearest possession that a man has, and once lost is almost impossible to regain. The possession of a good reputation is conducive to happiness in life and contentment. The loss of it, . . . brings shame, misery and heartache.'" (Eldredge, The Law of Defamation, *supra,* at pp. 12-13, quoting Judge James Gay Gordon, Jr.)

The public possesses an "independent interest" in the qualifications and performance of its public officials. (See *Rosenblatt* v. *Baer, supra,* 383 U.S. at pp. 85-86 [15 L.Ed.2d at p. 605]; *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 153 [18 L.Ed.2d 1094, 1110, 87 S.Ct. 1975].) To effectuate this interest, the public relies upon the press as its agent to gather and disseminate this information (see *Saxbe* v. *Washington Post Co.* (1974) 417 U.S. 843, 863 [41 L.Ed.2d 514, 527, 94 S.Ct. 2811] (dis. opn. of Powell, J.), as well as to provide a forum for the expression of criticism and opinion.

"The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs. Thus the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." (*Mills* v. *Alabama* (1966) 384 U.S. 214, 219 [16 L.Ed.2d 484, 488, 86 S.Ct. 1434].)

Indeed, the press is our citizenry's single most important check on governmental misconduct and secrecy. (*Role of the Press, supra,* 20 Santa Clara L.Rev. at p. 3.) Informed public opinion is "the most potent of all restraints" upon governmental wrongdoing or mismanagement. (*Grosjean* v. *American Press Co.* (1936) 297 U.S. 233, 250 [80 L.Ed. 660, 668-669, 56 S.Ct. 444].)

However, it is often impossible for an individual to obtain information about misconduct in government unless the press provides it. (Note, *The Right of the Press to Gather Information Under the First Amendment* (1978) 12 Loyola L.A. L.Rev. 357, 359.) Thus, it is fundamental that "[c]riticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized." (*Rosenblatt* v. *Baer, supra,* 383 U.S. at p. 85 [15 L.Ed.2d at p. 605]; *Gomes* v. *Fried, supra,* 136 Cal.App.3d at p. 932.)

This court's independent examination of the record must be conducted against the backdrop of our society's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (*New York Times, supra,* 376 U.S. at p. 270 [11 L.Ed.2d at p. 701].)

For these reasons, respondents as public officials must sometimes bear scathing and even false attacks subject only to those narrowly circumscribed exceptions embodied in the concept of actual malice. The public's interest

in reports of official misconduct, *even if they are factually erroneous and damaging,* outweighs the reputational interest of any individual. (See *New York Times, supra,* 376 U.S. at pp. 271-272 [11 L.Ed.2d at p. 701].)

■ As noted, liability under *New York Times* requires clear and convincing proof of a knowing falsehood or of reckless disregard for the truth. (*New York Times, supra,* 376 U.S. at pp. 285-286 [11 L.Ed.2d at pp. 709-710].) Recovery by public officials in defamation actions is constitutionally barred unless evidence is produced "of either deliberate falsification or reckless publication 'despite the publisher's awareness of probable falsity'. . . ." (*St. Amant* v. *Thompson, supra,* 390 U.S. at p. 731 [20 L.Ed.2d at p. 267].)

Reckless disregard for the truth "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." (*St. Amant, supra,* 390 U.S. at p. 731 [20 L.Ed.2d at p. 267].) Lack of due care is not the measure of liability, nor is gross or even extreme negligence. (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 259, fn. 11.)

*St. Amant* named several circumstances which may give rise to serious doubts. "The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." (*St. Amant, supra,* 390 U.S. at p. 732 [20 L.Ed.2d at pp. 267-268].)

However, as this court recently explained, neither investigatory failures, proof of the publisher's ill will, nor lack of objectivity will necessarily deprive even a defamatory falsehood of privileged status. (See *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at pp. 258-259; *St. Amant, supra,* 390 U.S. at p. 733 [20 L.Ed.2d at p. 268]; *Gomes* v. *Fried, supra,* 136 Cal.App.3d at pp. 934-935.)

■ In order to substantiate their claim of actual knowledge of falsity, respondents rely primarily on several pieces of Porter's deposition testimony. They assert this testimony establishes with convincing clarity that an ar-

rangement was made between Porter and Bergman whereby Porter would provide a false affidavit in exchange for Bergman's help in getting the detainer lifted. Respondents also argue appellants were reckless in ignoring information and failing to pursue several areas of investigation which would have demonstrated that Porter's affidavit was false and that Richard Lee was guilty.

Appellants, in turn, contend that the investigation they undertook to corroborate Porter and to develop the Richard Lee story proves their good faith belief in the probable truth of Porter's allegations. They argue that no deal was struck between Porter and Bergman and that they cannot be faulted for relying on Porter since they uncovered a substantial amount of information which they honestly believed corroborated Porter's veracity. Appellants maintain that respondents seek to impose a double standard whereby respondents could rely on Porter to prove up their libel claim, but would preclude appellants' similar reliance upon Porter in publishing the articles. Appellants also contend that their thoroughness in investigating the entire context of the Lee case establishes that they published without malice.

Initially, respondents argue that Porter's testimony concerning the prison interview shows that Bergman not only knew the affidavit was false but helped create it. The record, however, is not nearly so clear.

The tone of the prison interview was established by Porter during the first telephone conversation with Bergman. Porter not only told Bergman he had lied at the trial because of something respondents had done, but also expressed great remorse and even begged Lee's forgiveness. Bergman's testimony, and especially his contemporaneous notes of that conversation ("Let Richard know 'forgive me' . . . didn't do it because I wanted") strongly corroborate Porter's account. But it is Porter's *own* testimony that leaves no doubt he intended to and did convince Bergman that he was speaking the truth when he claimed to have lied at trial. Porter's admitted motive for lying was to get Bergman to visit him in order to obtain Bergman's assistance with the detainer.[23]

Bergman experienced an "emotional reaction" to this conversation in which Porter so persuasively pleaded for forgiveness and divulged his feelings of guilt and remorse. Bergman gave a lot of credence to Porter, particularly because Porter was allowing him to visit. In addition, by the time

---

[23]Porter had already made several inquiries about the detainer to other people and organizations. He testified his only concern was to get the detainer released and he was willing to do anything, and to use anyone, to accomplish that end.

of the visit, several ostensibly credible sources[24] had given Bergman reason to believe that there might have been serious problems with the manner in which Lee was convicted, and that the persons responsible for producing Porter as the state's key witness might have engaged in questionable behavior in Lee's case and others. In view of Bergman's state of mind, his reaction to Porter's momentary story change at the subsequent interview was neither surprising nor suspect.

According to Porter, Bergman opened the interview by reiterating the very thing Porter told him over the telephone: he believed some of Porter's trial testimony was false. He was interested in getting a statement from Porter to that effect, or in Porter's words, "another testimony." When Porter told Bergman he had told the truth at trial, Bergman expressed disbelief and said he thought the testimony was false.

It is unclear from Porter's deposition testimony whether this response— the lynchpin of respondents' argument—merely reflected Bergman's confusion over the discrepancy between Porter's posture on the telephone and his new position (i.e., he thought Porter had told him that the testimony was false); or reflected Bergman's statement of his own belief that Porter had lied.

In either case, respondents err in relying on this isolated piece of ambiguous evidence as sufficiently *clear and convincing* proof that Bergman knowingly solicited the intricate lie that Porter proceeded to tell and tell again. As the Supreme Court stated in *Bose Corp.* v. *Consumers Union of U.S., Inc., supra,* "'[a]nalysis of this kind may be adequate when the alleged libel purports to be an . . . account of events that speak for themselves,'" but is not appropriate where the event in issue "'bristle[s] with ambiguities.'" (466 U.S. 485 at pp. 512-513 [80 L.Ed.2d at p. 525], italics omitted.)

Bergman's reaction prompted Porter immediately to look to Bergman for cues and to fashion his story accordingly. He interpreted Bergman's remarks as "suggestions" of what Bergman wanted to hear.[25] Experienced at manipulation, Porter was able to identify Bergman's concern that Lee had been unfairly convicted and exploit it. Porter acknowledged that Bergman did not tell him to say anything. In fact, by the time he gave his affidavit to

---

[24]These sources were William Lee, reporter Avery, and Attorneys Garry, Halvonik and Hallinan.

[25]Porter's testimony that "[n]obody comes out and says something. You know, you just only suggest," itself indicates that he may have had a propensity to construe virtually anything said to him as a "suggestion" of what he should say or do.

Manning, Porter was quite convinced he had managed to "run a scam" on both Bergman and Manning.[26]

Furthermore, there is no evidence that Bergman's request that Porter give another story was a request that Porter give *false* testimony, although Porter apparently construed it as such a "suggestion," or came as a response to Porter's telling him that he had told the truth at trial.

Rather, the record as a whole indicates that Bergman asked Porter if, based on what Porter had told him about respondents' behavior, he would be willing to step forward to right the wrong he had committed against Lee—to give a different statement than he had given at trial. This evidence is a far cry from clear and convincing proof that Bergman's request that Porter give a different story was a request that Porter *lie*.

The record does demonstrate that Bergman agreed to help Porter on the detainer matter because Porter was willing to execute a sworn statement documenting his oral allegations. Bergman testified that he probably would not have continued to make inquiries about the detainer had Porter not signed the affidavit. However, unless Bergman were actually aware that Porter's claims were false, nothing illicit existed between them.[27]

While it may have been foolish and even grossly negligent of Bergman to entertain any discussion at all about the detainer at the same time he was asking Porter to swear to his accusations in an affidavit, this juxtaposition of events is of no moment if Bergman did not know Porter's accusations were false. Bergman's offer to make inquiries on behalf of someone incarcerated and unable effectively, or as easily, to fulfill a promise both men believed respondents had already made, was not nefarious. Absent knowledge of falsity, any arrangement between Porter and Bergman regarding the detainer was lacking in constitutional malice *considering Bergman's subjective viewpoint.*

In sum, the conversation that occurred during the interview is constitutionally inadequate to support a conclusion either that Bergman knew Porter's allegations were false or that he fabricated them. It may be appropriate to

---

[26]Porter testified that the reason he included so many of the defamatory details in the affidavit he recited to Manning was because he thought they would make his story more believable.

[27]Bergman's denial at trial that any arrangement was made between him and Porter regarding the detainer may indicate Bergman's misconception of what transpired or even a "capacity for rationalization." (*Bose, supra,* 466 U.S. at pp. 512, 513 [80 L.Ed.2d at pp. 524, 525].) However, neither this testimony nor Bergman's letters to Porter reporting on his inquiries about the detainer demonstrates that Bergman knew Porter was lying.

fault Bergman for his credulity, his failure to be more cynical or guarded in his responses to Porter, and particularly for his ill-timed offer of assistance with the detainer. However, the ambiguous statements and conduct upon which respondents rely do not demonstrate with convincing clarity that Bergman acted with knowledge of falsity.

Respondents also contend that appellants were reckless for failing (1) to reject Porter as an obviously biased source; (2) to reject his charges as inherently incredible; and (3) to investigate adequately his accusations. Respondents analogize appellants' reliance on Porter to the defendants' reliance on informant Burnett in *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. 130.

However, the plurality opinion in *Butts,* a "public figure" case, analyzed the adequacy of the investigation undertaken in preparation of the article in terms of whether it showed "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." (388 U.S. at p. 155 [18 L.Ed.2d at p. 1111].) This court has previously noted in *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 258, fn. 9, that the *Butts* standard is an *objective* one which has since been superseded by the subjective standard propounded in *St. Amant* v. *Thompson, supra,* 390 U.S. 727. Accordingly, respondents' reliance on *Butts* is misplaced.

Therefore, we must look to *St. Amant* for guidance. That case concerned a television broadcast in which defendant, St. Amant, repeated charges made by one Albin, a member of the Teamsters Union, that plaintiff Thompson, a deputy sheriff, had been involved in illegal payoffs and official corruption with St. Amant's political opponent. The Supreme Court held that Thompson had not satisfied his constitutional burden of showing that St. Amant's reliance on Albin was reckless.

In explaining the holding, the high court first clarified that in order to find a defendant published with reckless disregard, there must be either (1) "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication"; or (2) "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." (*St. Amant, supra,* 390 U.S. at pp. 731, 732 [20 L.Ed.2d at pp. 267, 268].) The court then made the following observations which are pertinent to this case. "Closer to the mark are considerations of Albin's reliability. However, the most the state court could say was that there was no evidence in the record of Albin's reputation for veracity, and this fact merely underlines the failure of Thompson's evidence to demonstrate a low community as-

sessment of Albin's trustworthiness or unsatisfactory experience with him by St. Amant.

"Other facts in this record support our view. St. Amant made his broadcast in June 1962. He had known Albin since October 1961, when he first met him with members of the dissident Teamsters faction. St. Amant testified that he had verified other aspects of Albin's information *and that he had affidavits from others.* Moreover *Albin swore* to his answers, first in writing and later in the presence of newsmen. According to Albin, he was prepared to substantiate his charges. St. Amant knew that Albin was engaged in an internal struggle in the union; *Albin seemed to St. Amant to be placing himself in personal danger by publicly airing the details of the dispute.*" (390 U.S. at p. 733 [20 L.Ed.2d at p. 268], italics added.)

Preliminarily, it should be noted that Porter's charges that he had been coerced, struck, and otherwise improperly induced to testify are not inherently improbable. *New York Times* and its progeny are founded upon the assumption that corruption at all levels of government, including those branches charged with enforcement and prosecution of the penal laws, exists and needs to be aired.

Moreover, on October 27, 1977, this court granted Richard Lee's petition for hearing, which was supported by Porter's allegations against respondents, and issued an order to show cause why relief in Lee's habeas corpus matter should not be granted. The superior court was ordered to hold an evidentiary hearing on the factual disputes raised by the petition.[28]

Significantly, in determining whether to grant such relief, this court had before it not only Porter's original affidavit but also his sworn recantations of that document contained in his affidavit of July 22, 1976, and in his deposition testimony. Therefore, appellants can scarcely be considered reckless for not rejecting Porter's allegations out of hand when this court has previously found those same charges to be sufficient to warrant further judicial intervention.

Appellants, and particularly Bergman, had reason to believe most of Porter's story. Porter was very worried that his life would be in jeopardy should he be returned to California to testify on Lee's behalf. There, Porter would be under the physical control of the people he had accused of misconduct. He expressed these concerns to Bergman several times. Like the source in *St. Amant,* Porter swore to his allegations in writing and told

[28]The order was signed by Associate Justices Manuel, Richardson, Mosk, and Newman and by Chief Justice Bird.

Bergman he was willing to testify if Bergman would "go to bat" for him and help assure his personal safety. Porter seemed to Bergman "to be placing himself in personal danger by publicly airing the details . . ." of his charges against respondents. (*St. Amant, supra,* 390 U.S. at p. 733 [20 L.Ed.2d at p. 268].)

Bergman's opinion of Porter's veracity was further influenced by Roger Ruffin, an experienced attorney and former municipal and superior court judge. Ruffin told Bergman that in his opinion the materials in the habeas corpus matter including Porter's affidavit constituted an excellent case for relief, and that Lee's habeas corpus case was one of the most complete he had seen.[29] (Contrast, *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. at p. 158 [18 L.Ed.2d at pp. 1112-1113] [media defendant's conduct held highly unreasonable due to failure to check source's story with someone knowledgeable in the field].)

Finally, it is noteworthy that respondents now seek a ruling from this court that since Porter was a prisoner with something to gain, there were obvious reasons to doubt his credibility and thus any reliance on Porter was reckless. Yet, thrice in the history of these proceedings, respondents have relied upon statements and stories from Porter: once, to convict Richard Lee; a second time to defeat Lee's habeas corpus claims; and a third time to obtain a multi-million dollar libel judgment. These litigious ironies do not excuse appellants from accountability for recklessness *if* they possessed a "'high degree of awareness of . . . probable falsity.'" (See *St. Amant, supra,* 390 U.S. at p. 731 [20 L.Ed.2d at p. 267].) However, they do undermine the strength of respondents' suggestion that "only a reckless man" could have believed the things Porter had to say. (*Id.,* at p. 732 [20 L.Ed.2d at p. 268].)

The Supreme Court has consistently confirmed that in the constitutional malice context, failure to investigate does not in and of itself establish bad faith. (See, e.g., *St. Amant, supra,* 390 U.S. at p. 733 [20 L.Ed.2d at p. 268]; *New York Times, supra,* 376 U.S. at pp. 287-288 [11 L.Ed.2d at p. 711]; *Beckley Newspapers* v. *Hanks, supra,* 389 U.S. 81, 84-85 [19 L.Ed.2d 248, 251-252].) Respondents nevertheless point to investigational deficiencies and claim these demonstrate reckless conduct. However, this court notes that appellants uncovered information during their one-and-a-half-year investigation which in their minds corroborated Porter's charges.

For example, appellants obtained independent information which they believed substantiated Porter's claim that respondents had made certain

---

[29]As noted, Ruffin included Porter's affidavit as an exhibit to the petition for writ of habeas corpus filed in superior court shortly after the articles were published.

promises in exchange for his testimony. They spent several hours trying to locate jail records to support Porter's claim that he had repeatedly met with respondents. They attempted, albeit unsuccessfully, to find examples of prior recitations by Porter of his story. In their opinion, there was no necessary correlation between the failure to locate certain witnesses or records and any lack of veracity on Porter's part.[30]

Most importantly, they learned from several sources that respondents had been accused by others of misconduct and questionable practices. Again, whether these similar accusations of misconduct were true is not in issue. What is dispositive is that appellants relied upon these ostensibly credible sources in forming a judgment that Porter's claims might have some validity.

In addition, appellants interviewed a variety of sources, from police officers to lawyers to Asians active in the Chinatown community, in order to explore Porter's charges and to understand the relationship between law enforcement and Asian youth in Chinatown. Appellants were also told by members of the police force that other Asian youths like Lee had been "framed" on false charges.

Appellants had some reason to doubt Porter's credibility. Manning had opined to Bergman that he had "some doubt" about Porter's veracity, although Bergman apparently construed this remark as a comment on Porter's chances of being believed in court in view of his status as a convict. Bergman knew that Porter was concerned about the detainer and wanted assistance. In the text of the affidavit, Porter made some superficially outlandish claims that neither of the reporters took literally.[31] Ramirez also wrote a note to

---

[30]Two examples illustrate that appellants' reasoning was arguably sound. Porter himself, testifying as respondents' key witness, never changed his story that he did in fact know a missionary named Louis Abbott who had visited him in jail. Although Bergman testified that someone at the jail told him a missionary named Louis Abbott did exist, respondents point to appellants' failure to document Abbott's existence as evidence of recklessness. Yet according to Porter, respondents' own witness, Abbott did exist. Thus, the fact that appellants were unable independently to document Abbott's existence does not establish that Porter invented him.

Similarly, Porter claimed in the original affidavit that he had received treatment at a "jail hospital" for a cyst which had been seriously aggravated when respondent Erdelatz kicked him. Later, although Porter recanted his allegation that he had been kicked, he testified on behalf of respondents that he had in fact received hospital treatment for a cyst that developed after he fell out of a bed. When Ramirez attempted to locate medical records of the cyst to corroborate Porter's allegation that he had been kicked, sheriff's deputies informed him that they were unable to locate any such records. Again, appellants' inability to lay their hands on this documentation does not necessarily establish that Porter was not treated for a cyst.

[31]For example, Porter claimed he had met with Merle "perhaps 30 times" for several weeks prior to trial in order to rehearse the written version of his trial testimony. Porter also stated that respondent McCoy promised him $35,000 in order to provide bail for Porter's girlfriend.

his superiors at the Examiner at the outset of his investigation indicating that Porter's statements should be viewed with "skepticism."

These questions about Porter did not rise to the level of "serious doubts." And in any event, they were largely dispelled as a result of the investigation undertaken in response to Porter's charges and appellants' subjective beliefs concerning the information they uncovered. The record as a whole supports the conclusion that at the time the articles were published, appellants did not possess a subjective awareness of probable falsity. (See *St. Amant, supra,* 390 U.S. at p. 731 [20 L.Ed.2d at p. 267].)

Finally, respondents posit that appellants were reckless by failing to reinterview Attorney Stanley Golde with whom Richard Lee had met to discuss a potential defense when he first learned he was being sought by the police in connection with the Leong homicide. Golde had told Bergman that the information he had about Lee would not be beneficial to the reporters. Bergman testified that he construed Golde's statement to mean that whatever information Golde had about Lee "might not be helpful" and could have been detrimental to Lee. The reporters decided that it was not in their interest to recontact Golde.

Assuming arguendo that respondents are correct when they speculate that Golde would have told appellants that Lee was guilty, this knowledge would not have seriously affected their view of Porter's veracity. Porter never told Bergman nor did he swear in the affidavit, that he knew Lee was innocent. Indeed, Porter declared in the first affidavit that Richard Lee would not talk about his case to Porter.

Respondents have never contended they were libeled by the articles' suggestion that Lee might be innocent. Their claim is based exclusively on Porter's published allegations. The "sting of the libel" (*Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. 130, 138 [18 L.Ed.2d 1094, 1101]), was that respondents improperly procured Porter's testimony about Lee. This "sting" would have remained had appellants published the identical charges of official misconduct, but conceded Lee's guilt. Similarly, the fact that appellants might have had reason to believe Golde would tell them Lee was guilty bears little if any relationship to their subjective belief in Porter's veracity.

Appellants were not obliged to assure themselves beyond a reasonable doubt that Lee was innocent before airing charges of official misconduct. These charges were logically independent of his guilt or innocence.[32] Ap-

---

[32]Appellants were clearly motivated in part by a belief that Lee was "framed." But both reporters testified that a primary concern was the propriety of the overall process by which Lee was convicted. As Ramirez testified, "The questions that were being raised were newsworthy and needed to be reported regardless of [Lee's] guilt or innocence. . . ."

pellants' states of mind as to Richard Lee's guilt or innocence are not determinative of their subjective attitudes toward the truth or falsity of Porter's charges.[33]

■ Respondent Merle additionally contends that the information contained in the May 21st article about the State Bar disciplinary proceedings was published with actual malice. At trial, Merle's counsel argued that this portion of the article constituted a known falsehood in that (1) Hallinan had told Ramirez that the bar had decided not to impose sanctions; and (2) Ramirez completely fabricated his testimony that "additional information" led him to believe that the recommendation to impose sanctions had not been overturned.

Respondents were able to make these arguments because the trial court erroneously ruled that Ramirez could not testify that the source of his "additional information" was reporter Larry Hatfield. Hatfield had covered State Bar affairs for years and Ramirez considered him to be a reliable source.

During discovery Hatfield testified that he informed Ramirez that a disciplinary review committee had decided to impose "unspecified disciplinary action" against Merle. Hatfield had obtained this information from a qualified State Bar source. However, Hatfield refused to divulge his bar source.

Respondents obtained a commissioner's order that should Hatfield fail to disclose his source, it would be deemed established for purposes of this action that there was no such source. The trial court misconstrued the commissioner's order to include a ban on any mention of Hatfield whatsoever. Therefore, Ramirez was prevented from testifying not simply as to the existence of Hatfield's source, but also as to the existence of his own source, Larry Hatfield.

Article I, section 2, subdivision (b) of the California Constitution and Evidence Code section 1070 prohibit contempt proceedings against publishers, editors, reporters and others for failure to reveal their sources of information. Code of Civil Procedure section 2034 authorizes the court to

---

[33]Similar reasoning applies to Ramirez's failure to ask Lee about the bullets that were found in Joe Fong's car in which Lee was a passenger on the night he was arrested. Respondents claim that Ramirez's failure to question Lee about the bullets is clear and convincing evidence of Ramirez's recklessness toward the truth or falsity of Porter's charges. However, there is no logical nexus between respondents' charge that Lee was involved in another homicide, and the substance of Porter's allegations. Moreover, Ramirez testified that he did not know until the trial in this case that the bullets found in Fong's car were of the same caliber as the bullets used in the other homicide.

impose reasonable sanctions against one who refuses to provide discovery or respond to appropriate questions during deposition.

This case presents the interplay between (1) a reporter's right not to divulge a source, and (2) those provisions governing the redress of wilful failures to disclose information during civil discovery proceedings. However, this court need not resolve the tension between these laws here. The commissioner's order clearly did not bar Ramirez from explaining that *he* had relied upon his source, Hatfield. Nor would there have been any logical basis for such a sweeping ban on Ramirez's testimony. Hatfield was the disobedient deponent, not Ramirez. Hatfield's confidential source at the State Bar was the object of controversy, not Ramirez's source. Ramirez did not refuse to disclose his source nor did he attempt to introduce evidence of Hatfield's source. The trial court erred in disallowing Ramirez's testimony that he had a source for the published statements.

When the May 21st article is evaluated in light of Ramirez's actual state of mind, it is clear that as a result of the information he received from Hatfield, Ramirez had reason to and did believe that a State Bar committee had decided to sanction Merle. Although respondents were allowed to argue that Ramirez invented this story, it was in fact based on a trusted source. No actual malice existed.

In *New York Times,* the high court refused to hold the publisher liable even though the Times would have discovered the falsity of the published material had they simply checked their own news files. (376 U.S. at pp. 287-288 [11 L.Ed.2d at p. 711].) In that case, the court affirmed that freedom of expression requires "'breathing space'"—room for error—if it is to survive. (*Id.,* at p. 272 [11 L.Ed.2d at p. 701], quoting *NAACP* v. *Button* (1963) 371 U.S. 415, 433 [9 L.Ed.2d 405, 418, 83 S.Ct. 328].)

The Supreme Court recently reaffirmed the fundamental precept that error is inevitable in free debate and that even demonstrably false statements must be protected absent actual malice. (*Philadelphia Newspapers, Inc.* v. *Hepps* (1986) 475 U.S. 767, — [89 L.Ed.2d 783, 793-794, 106 S.Ct. 1558, 1564-1565]; see *New York Times, supra,* 376 U.S. at p. 272 [11 L.Ed.2d at pp. 701-702]; Barron & Dienes, Handbook of Free Speech and Free Press, § 61.1, p. 226.) The critic of official conduct is not compelled "to guarantee the truth of all his factual assertions" for "to do so on pain of libel judgments virtually unlimited in amount" results in self-censorship. (*New York Times, supra,* 376 U.S. at p. 279 [11 L.Ed.2d at p. 706].)

In light of these settled principles of constitutional law, this court concludes that appellants did not harbor actual malice when they published

the articles containing false allegations of official misconduct involving respondents.[34]

## V.

One additional issue that arose in the course of this trial must be addressed.

 The jury was instructed in the modified language of BAJI No. 14.71 (6th ed. 1977) in pertinent part as follows: "If you find that plaintiffs suffered actual damages as a proximate result of the conduct of the defendants on which you base a finding of liability, you may then consider whether you should award additional damages against defendants, for the sake of example and by way of punishment. You may in your discretion award such additional damages, known as punitive or exemplary damages, if, but only if, you find by clear and convincing evidence that said defendants were guilty of oppression, fraud, or *actual malice in the conduct on which you base your finding of liability*.

"'Malice' means a motive and willingness to vex, harass, annoy or injure another person. Malice may be shown by direct evidence of declaration of hatred or ill-will *or it may be inferred from acts and conduct, such as by showing that the defendant's conduct was wilfull [sic], intentional, and done in reckless disregard of its possible results*." (Italics added.)

This instruction was apparently based on Civil Code section 3294,[35] which provides guidelines for the imposition of punitive damages in civil cases. The trial court refused to instruct in the language of section 48a, which governs the award of punitive damages in newspaper libel cases. Section 48a, subdivision 4(d), defines "actual malice" for purposes of punitive or exemplary damages, as "that state of mind arising from hatred or ill will toward the plaintiff; provided, however, that such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publication or broadcast at the time it is published or broadcast shall not constitute actual malice."

 In order to reach the issue of "actual malice" under section 48a for purposes of awarding punitive damages, the jury must first have found liability based on *New York Times* "actual malice." These two types of "actual malice" are very different.

---

[34]Since this court holds that the evidence did not establish actual malice, it is not necessary to reach the issue whether appellants were absolutely privileged under Civil Code section 47, subdivision 4, or the numerous remaining evidentiary claims.

[35]All statutory references are to the Civil Code unless otherwise noted.

The *New York Times* test "directs attention to the 'defendant's attitude toward the truth or falsity of the material published . . . [not] the defendant's attitude toward the plaintiff.'" (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 257.) Actual malice under *New York Times* "is quite different from the common-law standard of 'malice' generally required under state tort law to support an award of punitive damages. . . . [C]ommon-law malice—frequently expressed in terms of either personal ill will toward the plaintiff or reckless or wanton disregard of the plaintiff's rights—would focus on the defendant's attitude toward the plaintiff[] . . . not toward the truth or falsity of the material published." (*Cantrell* v. *Forest City Publishing Co.* (1974) 419 U.S. 245, 252 [42 L.Ed.2d 419, 426-427, 95 S.Ct. 465].) "'[I]ll will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard.' [Citations.]" (*Letter Carriers* v. *Austin, supra,* 418 U.S. at p. 281 [41 L.Ed.2d at p. 760].)

 The punitive damage instruction in this case effectively dissolved the distinction between these two types of "actual malice." It did not require the jury to base its punitive damage award on a finding that defendants bore "hatred or ill will toward the plaintiff."[36] The jury was informed that it could base its finding of malice either on direct evidence of such hatred or ill will, *or* on intentional conduct or reckless disregard for the results of that conduct.

By the reference to and juxtaposition of "intentional conduct" and "reckless disregard," the instruction given was strikingly similar to that which the jury received regarding the determination of liability based on *New York Times* actual malice.[37] Therefore, the jury may well have confused the two phrases and improperly based its award of punitive damages on its finding of *New York Times* actual malice.

The danger of confusion was compounded by the use of the word "conduct" in the first part of the punitive damage instruction. The jury was instructed that it could award punitive damages if it found by clear and convincing evidence that the defendants "were guilty of . . . actual malice in the conduct on which you base your finding of liability." The flaw in this sentence is apparent. If the jury found liability based on appellants'

---

[36]Instead of tracking section 48a's definition of actual malice as "hatred or ill will toward the plaintiff," the instruction defined malice as a willingness and motivation to vex and harass which could be *shown* by direct evidence of hatred or ill will.

[37]The jury was instructed, in accordance with *New York Times,* that in order to find appellants liable, it had to find they published libelous statements about respondents, and that "at the time of the publication of said statements [appellants] knew the statements were false, or published or allowed the statements to be published with a reckless disregard of the truth or falsity."

conduct in publishing the articles with *New York Times* actual malice, it was then free to award punitive damages based on that same conduct. Such a result would eliminate the sharp distinction between the actual malice required by *New York Times* and that necessary to award punitive damages under section 48a.

This instruction should not have been given. However, it is not necessary to reach the impact of this error in light of the court's finding that the record does not establish liability under *New York Times*.

## VI.

In sum, this court holds under *New York Times* that the evidence does not establish with convincing clarity that appellants possessed actual malice when they wrote and published the disputed articles.

The judgment of the Court of Appeal is reversed with directions to reverse the judgment of the trial court.

Broussard, J., Reynoso, J., McClosky (Eugene), J.,* and Johnson (Earl), Jr., J.,† concurred.

Mosk, J., and Lucas, J., concurred in the judgment.

---

*Associate Justice, Court of Appeal, Second District, Division Four, assigned by the Chairperson of the Judicial Council.

†Associate Justice, Court of Appeal, Second District, Division Seven, assigned by the Chairperson of the Judicial Council.

## APPENDIX A

San Francisco Examiner (Wednesday, May 19, 1976)
"How lies sent youth to prison for murder; Curious conviction
 in Chinatown trial"
By Raul Ramirez, copyright 1976, San Francisco Examiner

On Nov. 1, 1972, Richard W. Lee, 19, was convicted of first-degree murder in what San Francisco authorities hailed as a major breakthrough in their attack on Chinese youth gangs.

Now, 3½ years later, an Examiner investigation has uncovered evidence that he was convicted on the basis of perjured and misleading testimony exacted by a prosecution that badly needed a conviction.

Lee is serving a life sentence at Deuel Vocational Institution in Tracy.

His conviction by a jury came after a series of widely publicized shootings that prompted then-Mayor Joseph Alioto to declare that the streets of Chinatown were nevertheless "the safest place in town for tourists and Caucasians." The mayor asked for immediate police action to make them safe for Chinese.

Lee's trial had unfolded in a city shaken by a succession of spectacular slayings among young Chinese and a degree of alarm echoed by the highest law-enforcement authorities in California. On the morning 12 jurors retired to decide Lee's fate, Bay Area newspapers quoted state Atty. Gen. Evelle Younger as telling a press conference in Sacramento:

"Chinese gangs are fast becoming serious threats in the state and other parts of the country in cities and towns having Chinese communities."

In San Francisco, where a string of more than a dozen killings spanning a two-year period had baffled police and frightened many in The City's growing Chinese community, a conviction was viewed as a significant accomplishment. The guilty verdict in Richard Lee's trial was hailed as such in press reports.

The peculiar circumstances surrounding the Lee case, documented by the Examiner during a lengthy investigation, include:

•The testimony of a cellmate that Lee had confessed to the killing and boasted of his gang connections while awaiting trial. The cellmate, in a sworn statement obtained by the Examiner, says now that his testimony was fabricated by Lee's prosecutor. He says he was induced to testify under threat of violence and promises of leniency.

•The identification of Lee as the killer by a witness to the slaying. That witness, a 16-year-old girl, now swears she was never sure of the killer's identity but was rebuffed by prosecutors and police when she told them so. She says she agreed to testify against Lee only after being falsely assured that 11 other witnesses had also identified Lee. In fact, she and the cellmate were the two main pillars in the prosecution case.

•The assertion of another young witness, once a prime suspect in the slaying who was not prosecuted, that the killer was not Richard Lee.

(The San Francisco police homicide inspector who investigated Poole Yig Leong's killing declined to discuss the case. Pierre Merle, the prosecutor who obtained Lee's conviction, who is now employed by a New York investment firm, did not respond to several telephone requests to discuss the case with the Examiner.

Lee's conviction closed the file on the shooting death of Poole Leong, 22, a Hong Kong-born man who the state claimed was a key member of a gang at war with Lee and friends.

On June 13, 1972. Leong was standing outside a housing project apartment at 895 Pacific Ave. According to police reports and eyewitness testimony, Leong was shot while talking on a phone passed out of an apartment window at his request for an impromptu talk with a girlfriend.

Within hours after the shooting, the discrepancies surrounding the Lee case began unfolding:

According to a police report prepared that night, "Suspect No. 1," the gunman, was a "Chinese male, 14-15 years, 5'3", skinny build, straight black collar-length hair." Richard Lee, a bank teller who was arrested 14 days later, was 19 years old at the time, 5'8", medium build. His hair was black and straight.

* * *

The prosecution version of what happened that summer night, and of the events leading to the shooting, was outlined during Lee's five-day trial before San Francisco Superior Court Judge Walter Calcagno four months later. The scenario was dramatic, yet simple:

Richard Lee, police intelligence officer Diarmuid Philpott testified, was a member of a gang of hoodlums headed by his close friend, Joe Fong. Fong's group and another youth gang, the Wah Chings (Young Chinese) were involved in a struggle for power and territory in which many had already died, Philpott told the jury.

The immediate motive for Leong's murder was described as retaliation for an attempted kidnapping of Fong's younger brother.

On the morning of the killing, Chung Way Fong, then 15, had been threatened by several youths affiliated with his brother's rivals, the Wah Chings. His assailants had approached him aboard a Muni bus headed for Marina Junior High School. They had shown him the handle of a gun protruding from someone's belt and asked for Joe Fong's whereabouts.

Then, they had pointed to a car driving in the opposite direction and told him it was Leong's. They ordered him to follow them off the bus and into the car. The young Fong eluded the youngsters as they left the bus. He told the bus driver, who reported the incident to Muni. The youth, later that morning, also reported the incident to school officials and police.

Prosecutor Pierre Merle theorized at Lee's trial that Leong's murder had been ordered after Chung Way Fong told his older brother of the incident early that evening.

• • •

Shortly after 10 p.m. that same night, Poole Leong strolled down Pacific Avenue and rapped on a ground floor window of apartment 31 at 895 Pacific, one of the buildings in the huge Ping Yuen federal public housing project.

A 16-year-old girl came to the window and the two talked briefly. Leong then asked to speak with another girl and his friend dialed a number and handed him the telephone through the window. She walked back to join her younger sister and a neighbor. Her sister slept nearby on a living room couch.

The girl's 13-year-old brother stepped out of the small apartment and joined Leong outside. The youngster sat on a wooden bench alongside the building while Leong stood next to the window, his back to a small patio area. The sunken patio was separated from the Pacific Avenue sidewalk by a hedge and wall. To reach the area, it was necessary to step down from a platform adjoining the sidewalk.

What happened next, at about 10:20 p.m. June 13, 1972, was described by the girl's brother:

Leong had been on the phone for about five minutes when "two guys came up from behind him and he turned around," the boy told homicide inspectors Frank McCoy and Edward Erdelatz two hours later.

The youngster identified one of the two, the one not carrying a gun, as Weyman Tso, then 16. Tso's grandparents lived across Pacific Avenue in another public housing project building. He had been involved in fights with the young witness and they knew each other well.

(In a statement obtained by the Examiner, Tso claims to have walked upon the shooting unaware of what was happening. Frightened, he went into hiding immediately after the incident and did not surface until he turned himself into police eight months later, after Lee's trial. He says Richard Lee, whom he knows well, was not the killer and that he did not recognize the gunman.)

In a taped interview with police, the girl's brother said he greeted Tso when the two youths walked up. He did not recognize the gunman, he said. Then, several shots rang out.

The youngster said he pulled his coat over his head as shots were fired. After the shooting was over he looked up and saw the two youths run away in the direction of another Ping Yuen project building, a highrise across Pacific Avenue. Several breezeways on that building's ground floor provide easy passage to Broadway's busy neon-lit strip.

At Central District police station on the fringes of Chinatown, the young witness later examined more than 100 pictures of youths whom police believed to be connected with gangs. Richard Lee's picture was among them. He did not pick it out. He did identify a picture of Tso.

• • •

When the shots were fired, the girl who had given Leong the phone thought they were firecrackers. Then she looked out the window and saw "two guys" standing outside for a split second. One held a gun in his right hand. She recognized the other one as Weyman Tso, a fact she promptly told police.

She told investigating officers McCoy and Erdelatz that she had taken "just one look" at the gunman, who looked like someone she had seen "a couple of years ago in Chinatown."

After a brief interview with the officers, she was asked to look at the photographs on file. Her description of the gunman differed slightly from her brother's: She described him as a Chinese person in his early 20s, about 5 feet 6 inches tall—a "thin" man. Her brother

described a man 5 feet 3, 14 to 15 years old. Police reports prepared that evening carried his description of the killer.

At 1:25 a.m. on June 14, three hours after Poole Leong was gunned down, her voice was recorded in still another talk with inspectors McCoy and Erdelatz.

Sounding tired and confused, she estimated the number of pictures she had looked at as about "6,000." The officers corrected her and she agreed that there were at least 100.

Softly, she said the man whose picture she had picked out was the man who had shot Poole Leong. It was Richard Lee.

For the next two weeks, Richard Lee reported to work as normal at the Civic Center branch of the Wells Fargo Bank. Although a warrant for his arrest was issued on June 16, it was not until 11 days later, in the early morning hours of June 27, that he was arrested after a car in which he was a passenger was stopped for a traffic violation.

Two weeks later, on July 13, 1972, the girl testified at a preliminary hearing on the case. She seemed much less sure of the identity of the killer.

Asst. Dist. Atty. Martin Harband asked her about a police lineup the prior day, when she had identified Richard Lee as the man whose picture she had pointed out the evening of the murder:

Q. Did you pick someone out yesterday?
A. Yes.
Q. Who did you pick?
A. I say it looks like him.

At this hearing, the girl's uncertainty was clear. Unlike prosecutor Merle, Harband handled the preliminary hearing with no attempt to push her:

Q. . . . did you pick Richard Lee yesterday?
A. I said it looks like him.
Q. It looks like who?
A. Richard Lee.
Q. O.K. Did you pick him out because he was the one you saw with the gun on June 13?
A. I said I am not sure.
Q. What are you sure about . . .?
A. I already told you.
The judge. Try to repeat.
A. Like I feel guilty if I put the wrong person in.
Q. . . . did you see the face of the man who was holding the gun?
A. No. Not exactly . . . It looks like the picture I picked out but then I say I'm not sure.

Harband explored the subject of fear, one that the prosecution was to return to time and again in seeking to explain the girl's reluctant testimony. She had told police the night of the murder that she was frightened. Harband asked her to explain, and she responded:

"That night, I don't know. Like that night I was scared and everything and I was nervous, so, like I said, that night I remember what, but like I say, after I thought it over it doesn't seem to me like the same person when I tried to imagine him. That is what I told you."

Fear would become the central thrust of the prosecution's case against Richard Lee. From the outset, it sought to portray Lee as an awe-inspiring gangster whose self-assurance came from knowing that fear would silence prospective witnesses.

Several attempts were made to impress the jury with this aura of fear during Lee's trial.

At one point, the girl was questioned about fears of retaliation. A point was made that, after the shooting, a police watch of her home had been instituted at her parents' request.

This police concern was odd. The department stationed a police car outside her home for several weeks, day and night. But police did not provide any further protection while she went to school and moved freely, alone, about Chinatown.

No explanation was ever given as to why she and her brother would hesitate to identify Richard Lee, who was incarcerated, and not the other suspect, who was still at large and presumably in a better position to carry out any revenge plans.

In a recent interview, the girl described how she picked out Richard Lee's picture the night of the murder:

"I went through a number of them (pictures). Then there were a couple of pictures, I say, uh, it could be him, or it could be him . . . I told them, well I wanted to go home badly but they said that I have to wait until I picked someone. I felt that I can't leave that room unless I find someone. . . ."

After returning home in the early morning hours, she lay in bed, unable to sleep:

"I was thinking, trying to think of what happened. I think of that picture and the guy that I picked out and I keep thinking, I go, no, God, what am I doing? . . . That wasn't him I picked out. I didn't really get to look at the guy that did the shooting."

When, later, she told police of her second thoughts, she was rebuffed: "They asked me, is it because I got a phone call or someone threatened me or this and that and that is why I changed my mind . . . I told them no. I didn't get no phone call" she said.

The inspectors sought to reassure her, the girl says:

"They said that there were 11 other witnesses, and I thought that what I had to say wasn't that important because I was a minor and there are 11 other witnesses, so I thought it was so that they told me that . . . I think, oh well, if there are 11 other people, witnesses, it must be him. Then what I've got to say isn't important."

Noting that prosecutor Harband accepted her statements at the pre-trial hearing with no attempt at channeling her testimony, she added: "Then (later on) the second guy (Pierre) Merle, told me he was pretty rough. He was yelling at me . . . He was pretty mean . . . He got very angry at me and I became very frightened of him.

"What I think is that he was angry at me because I was changing my story," she said.

At the lineup, she said, she balked at picking out the shooting suspect because "I'm not even sure it's him."

"And they go, 'OK, pick out the guy in the picture.

"Therefore when I looked at the people in the lineup I picked out Richard Lee because it was he that I recognized as being the person whose picture I had picked out. That was easy to do because the five other persons in the lineup all looked different from Richard Lee, who was the shortest of the group."

The Lee trial experience, and the discovery afterward that she had been misled, has embittered her, she says.

"I thought police are very helpful and nice . . . I try to be helpful to them . . . But later on I don't think they are nice any more . . . they lied to me. That's what I don't like. I thought police couldn't lie and everything. Then another thing is that for someone to want to talk to they were, they were pretty mean."

She asked the Examiner to withhold her name, because, she said, she is embarrassed about having helped convict Lee in such a way.

• • •

San Francisco attorney Roger Ruffin who recently agreed to represent Lee, is using the girl's statements and other information uncovered in the Examiner investigation and elsewhere, and is preparing a writ of habeas corpus he expects to file on Lee's behalf in a few days in an attempt to obtain judicial review of the young man's case.

Ruffin, a former Superior Court judge in San Diego, says his review of the Lee case indicates he was wrongfully convicted:

"In my view, Richard Lee was victim of community hysteria regarding Chinatown's so-called Chinese youth gangs," Ruffin said.

The week preceeding Richard Lee's trial, attorney Patrick Coyle, the young lawyer assigned by the firm of James Martin MacInnis to defend Richard Lee, retired to a family mountain cabin. He now recalls he "ate good food, didn't drink, just getting ready" for the trial, which he thought was still 10 days away.

Coyle felt confident that the trial would result in Lee's acquittal. The prosecution's case, as outlined to him in discovery proceedings, rested mainly on the girl, a reluctant witness whose identification of Richard Lee was weakened by her own concern about putting the wrong person in prison.

The rest of the case against Richard Lee, he felt, was based on inneundo and guilt-by-association testimony from police officials.

Coyle returned to San Francisco the weekend of Oct. 22. The trial, he thought, was still a week away, set for Oct. 30. On Oct. 24, he wandered into the Hall of Justice to check up on another case and found, to his surprise, that the case of the People vs. Richard Lee had been rescheduled—for that day.

A message telling him of the change had been telephoned to his office the prior Friday. Patrick Coyle had not been in his office.

Although thrown off balance by this change, Coyle remained confident.

But he did not know that a new character waited in the wings, where he had been secretly primed and kept by Asst. Dist. Atty. Merle and Inspectors McCoy and Erdelatz.

That character was a most unlikely one, a surprise witness whose testimony proved devastating to Lee's case.

TOMORROW: The trial.

*The Examiner inquiry into the Richard Lee case was made with the collaboration of Lowell Bergman, a free-lance investigative reporter aided by a grant from the Fund for Investigative Journalism of Washington, D.C.*

### D.A. promises 'full cooperation'

San Francisco Dist. Atty. Joseph Freitas says he will "fully cooperate" in any attempt to determine "through the established process" whether Richard W. Lee was wrongfully convicted in a 1972 Chinatown murder case.

Freitas' statement came after San Francisco attorney Roger Ruffin, a former San Diego Superior Court judge, said he would seek a court review of the Lee case.

The district attorney was briefed by The Examiner last week about the content of a series of stories about the Lee case beginning in today's editions of the paper.

The stories include allegations that a former assistant to then-Dist. Atty. John Ferdon pressured one witness into giving misleading testimony and fabricated the testimony of another.

Freitas said his staff is reviewing the contents of his office's files in the Lee case, but has found no irregularities. He acknowledged that it would be highly unlikely that anyone committing improper actions would allow them to be reflected in official files.

"We will fully cooperate with the court in determining what the truth is," he said. "This office has an interest in seeing that justice was or will be done in this case."

Freitas vowed he would take legal or administrative action against present or past members of his office or of the police department who his investigation shows acted improperly or illegally.

The Examiner stories include allegations from two key witnesses who say they were pressured by former prosecutor Pierre Merle and police to give misleading or false testimony.

Merle, now an investment firm's lawyer in New York, did not respond to repeated requests to discuss the case.

Frank McCoy, a police homicide inspector who handled the Lee case, declined to talk about it with the Examiner. He said the trial transcript should "reflect on the facts of the case."

"There is no reason to get together," he told a reporter. "The case went to a jury before a competent judge. The proper way of handling it is to take it to the district attorney's office."

McCoy, whom other law enforcement people described as a well-respected investigator, said he knew "where these things (allegations) are coming from—from his brother."

Lee's brother, William, had protested the conviction shortly after the 1972 trial.

The Examiner stories, however, are based on an independent investigation and on interviews with witnesses and others close to the case.

### APPENDIX B

San Francisco Examiner
Thursday, May 20, 1976
Chinatown murder:
Witness recants
By Raul Ramirez
©1976 San Francisco Examiner

A surprise awaited Richard W. Lee on Oct. 24, 1972, when he went on trial in San Francisco on charges that he killed another young man in a Chinatown gang assassination.

Lee, a 19-year-old bank teller, was accused of shooting Poole Yig Leong, 22, in what police said was retaliation for an attempted kidnaping of a gang leader's brother.

Until his five-day trial began before Superior Court Judge Walter Calcagno, the case against Lee seemed hollow.

It consisted of testimony from policemen who said Lee was a member of a youth gang dubbed the "Joe Fong gang" and would have had reason to kill Leong, whom they identified as a member of the rival "Wah Ching gang."

The sole evidence linking Lee to the killing was the hesitant identification of him as the gunman by a teenaged girl who initially said the killer "looks like" Lee.

But in the trial's opening session, Asst. Dist. Atty. Pierre Merle revealed that he would have another witness—a man who had been quietly primed for months by him and police homicide inspectors.

That man's testimony was to be crucial in Lee's conviction of first-degree murder five days later.

He was Thomas Porter Jr., also known as John Henry, a young black man from the Midwest then facing a desperate legal situation of his own. He would testify that Lee had confessed to Leong's murder during intimate talks while the two shared a cell in the San Francisco County Jail.

Porter's testimony also was used to explain the absence of other substantive evidence and the reluctance of an eyewitness to identify Lee positively as the killer.

Testifying for several hours, Porter described Lee as a cocky gang hit-man unafraid of conviction because his gang would scare away witnesses.

Porter claimed to know Swahili and Cantonese. He boasted of his familiarity with Chinatowns in San Francisco and Chicago and of having gained Lee's confidence.

Porter is now serving time at a federal penitentiary for an auto theft conviction that preceded his San Francisco stint. He is no longer under the jurisdiction of the city's district attorney's office.

In a sworn statement obtained by the Examiner, Porter now repudiates his testimony at the Lee trial. He says it was fabricated by prosecutor Merle and that he agreed to perjure himself only after he was threatened by police.

Porter's statement, coupled with the assertion of the key prosecution "identification" witness—the teenaged girl—that her testimony was colored by false statements told her by police, puts in question the manner in which the People of California obtained Richard Lee's conviction.

Lee's trial was staged at a time when a long string of unresolved killings among Chinese youths received strident media coverage and was the focus of concern among city officials. Some worried that reports of violence would affect tourism.

Police were baffled and embarrassed by youth violence. First fights had inexorably escalated into premediated (sic) killings. and all police could do was cite nefarious codes of silence and describe the inability of white officers to penetrate the Chinese community.

Then came the evening of June 13, 1972.

Poole Yig Leong, an unemployed man who hung around with immigrant Chinese youngsters, was gunned down as he spoke on a telephone that had been passed out an apartment window at his request in a Chinatown housing project building at 895 Pacific St.

Of the three persons who saw the killer, only one, a 16-year-old old girl, tentatively identified Lee as the gunman. The girl's brother claimed he had not seen the killer's face. A third witness, a young man once considered a prime suspect in the incident, after the trial turned himself into police and was released without being charged. He says Lee was not the killer.

The girl's identification was hesitant. She says she was never sure that Lee was indeed the man she saw with the gun that night, but that she picked out his picture from a police file because Lee "looked like him" and because she thought she would be required to pick out a photograph before being allowed to go home.

But police to whom the girl had confided the night of the murder that she feared Chinatown's "gangs," interpreted her hesitancy as fear of retaliation if she testified against Lee. They dismissed her protests that she wasn't sure whether Lee was the killer.

Later, when investigating officers learned that the 15-year-old brother of youth gang figure Joe Fong had been threatened by several Wah Ching toughs on a Muni bus the morning of Leong's murder, they concluded that they had found a motive for the slaying.

Police theorized that Leong was killed in retaliation for that incident. Lee's name fit into that scenario, for Chinatown police knew Richard Lee as a friend of Joe Fong.

Lee was arrested two weeks later when, late one night, a car driven by Fong was stopped for a traffic check. Although Lee had reported to work each day at the Civic Center branch of the Wells Fargo Bank, where he had worked for nearly a year, police had not located him until the morning of June 27, 1972.

Earlier that night, Chinatown youth worker Barry Fong Torres had been murdered in still another highly-publicized slaying. Police hinted—and San Francisco's newspapers dutifully reported—that Lee's arrest may have solved that murder. (The Fong Torres killing, however, remains unsolved.)

Richard Lee and Thomas Porter met shortly after Lee's arrest. The two became acquainted when Porter came to Lee's aid at the San Francisco City Jail when a deranged prisoner seemed about to jump on the Chinese youth.

Porter was to testify later, that this incident spawned an unlikely friendship, which resulted in Lee confiding that he had killed Poole Leong, that he had played key roles in other Chinatown murders and that he was a member of a gang which would silence any prospective witnesses.

A few days after Lee and Porter met, Lee was transferred to the county jail one floor higher in the Hall of Justice complex at 850 Bryant St. He had been unable to post the $100,000 bail set by Judge Claude Perasso at a preliminary hearing.

Porter, then 21, had been apprehended in San Bernardino with his girlfriend shortly after commandeering a taxicab and its driver in San Francisco.

In and out of jail since he was 16, Porter faced four major felony charges; robbery, assault with a deadly weapon, kidnapping and manufacturing prohibited weapons for sale.

His situation was desperate. Far from his native Oklahoma, he was wanted by federal authorities for escaping from El Reno Federal Penitentiary there, where he had been serving a sentence for auto theft. A combination of the California and federal penalties could have put him away for life.

Then, he was assigned to the cell at the city jail with Richard Lee. A few weeks later, after Lee had been taken upstairs to the county jail, Porter joined him there—again in the same cell. The two shared a 10-by-12-foot living area with 10 other men through the summer and early fall of 1972.

During those months, Porter testified later, they became friends—the San Francisco-born young Chinese-American and the black man from Oklahoma.

As early as August, 1972, Porter had developed other acquaintances, whom he saw repeatedly. They were prosecutor Merle and homicide inspectors Frank McCoy and Edward Erdelatz. In a series of meetings in the Hall of Justice complex, they assembled the prosecution's master stroke against Richard Lee.

Richard Lee was a shaken young man when he was ordered to stand trial for the murder of Poole Yig Leong. A July preliminary hearing had surprised him. He had expected to see the charges against him dropped because he believed his arrest to have resulted from mistaken identification or from what he viewed as routine police harassment of Chinese youths.

Shocked by the high bail, he became wary of everyone. Several of his cellmates testified that he was uncommunicative. Even his lawyer, Patrick Coyle, remembers him as "paranoid," reluctant to discuss any aspects of his life in the county jail's interview rooms because he believed he was the victim of a conspiracy.

It was this attitude that made Porter's testimony that much more incongruous to Coyle when it came at the trial.

Coyle scored a point or two by bringing other cellmates to the witness stand to testify about how Porter had told them they could get lenient sentences if they "cooperated" with prosecutors and helped police put together cases against others. None had heard Lee discuss his case with Porter or with anyone else.

(Lee says his stock answer whenever asked by his cellmates, including Porter, about the charges against him was, "That's what they say. That's what they say.")

Coyle's request at the trial that an interpreter be summoned to test Porter's purported fluency in Cantonese was denied by Judge Calcagno.

Porter's testimony was devastating. After befriending Lee, he said on the witness stand, the young man confessed to the murder, told him he had buried the murder gun and that members of his gang had dug it up after his arrest, broken it up into pieces and thrown it into "lakes" around San Francisco.

He testified that Lee had repeatedly boasted about his gang affiliations and the strength of their influence.

Porter told the jury he had voluntarily sought out police agents after Lee's disclosures. He declared he had not been threatened by anyone or offered leniency by police or prosecutors. To buttress his testimony, prosecutor Merle introduced as evidence a piece of paper on which Lee had written the name of Joe Fong's brother, Kit Fong, and a telephone number.

Porter testified that Lee had given him Fong's name and number as a possible contact if he wanted to buy weapons when he left jail.

(Lee says Porter had asked him for the name of someone who could help him find a job if he got out of jail. Fong, then counselor at a San Francisco youth program, was a logical choice, he says.)

Porter's startling testimony overshadowed the uneasy, shaky identification by the teenaged girl. It even helped explain her hesitation.

Porter's declarations were augmented by the testimony of Terry Sullivan, the policeman who headed the Police Activities League's youth hall in Chinatown, and Sgt. Diarmuid Philpott, whom Merle introduced as an expert on Chinatown youth.

Philpott, a long-time Chinatown policeman who is now in the department's intelligence squad, testified that Lee was a "right hand" lieutenant of Joe Fong. He described Leong as a high ranking cohort of Wah Ching leaders.

Sullivan testified that he had once seen Lee at a gun firing range, where the officer had taken other Chinatown youngsters for target practice. Lee was holding a handgun, Sullivan testified. He did not say (and was not asked) that many Chinatown youths visited the gun range regularly as guests of police.

At 9:30 a.m. (Nov. 1, 1972) the seven women and five men who were to decide Richard Lee's guilt or innocence retired to deliberate. Six and a half hours later, their verdict was in: Guilty, first degree murder. Twenty-one days after that Lee was sentenced to life in prison.

The day after Lee's conviction, San Francisco's newspapers reported unnamed police officials hailed the jury's judgment as a breakthrough—the first conviction in a Chinatown youth gang warfare case.

TOMORROW: The "case" against Richard Lee breaks down.

## Appendix C

San Francisco Examiner
Friday, May 21, 1976
juror's anguish:
He wept as he voted guilty

When he voted to convict Richard W. Lee of first-degree murder three and a half years ago, Ivan Wright cried.

"It broke me up," he recalls now. "I cried like hell when I had to give this verdict."

His sorrow, Wright said, came from a nagging "emotional" doubt that Lee may not have been the man who killed Poole Yig Leong on the evening of June 13, 1972.

Lee was sentenced to life imprisonment for the killing, which police attributed to Chinatown youth gang warfare.

Wright, a retired hotel deskman and auditor, said he was bothered first by the testimony of a cellmate who claimed that Lee had confessed to the murder while awaiting trial.

"I knew that he was full of baloney," Wright said. "I don't think anybody paid attention to his testimony. He was in the slammer. He had reason to give a story."

Then, Wright added, there was the testimony from an eyewitness to Leong's killing, who hesitantly said that Lee was the man who shot Poole Leong.

"I had my doubts and a couple others (jurors) did," Wright said. "Neither attorney (defense or prosecution) ever said to that girl, 'Is the man who did the shooting in this courtroom right now?' I had mixed feelings, feelings that have always haunted me since then."

Wednesday, when Wright read an Examiner report of how both the cellmate and the young eyewitness, a 16-year-old girl at the time of the trial, now say they tailored their testimony to suit the prosecution because of pressure from authorities, he cried again.

"My conscience is killing me," he said in a telephone call to the Examiner.

"When we first went to deliberate, I wrote a question mark on the first ballot. That girl . . . I didn't exactly believe her . . . but when they read it back in the transcript (at his request) it sounded pretty good when written down. I had my emotional doubts. I'm even more heart-broken now," he said.

He said a majority of the jurors had been in favor of conviction from the outset, but he and a few others held out.

"I had a sixth sense that that wasn't right. She had answered so vaguely (when asked to identify Lee as the killer). And where do you separate reason from emotion?"

Finally, after several hours of debate, Wright agreed to a guilty verdict.

"I had to go along with the verdict finally," he said. "The instructions from the judge on reasonable doubt were to decide the case on the factual information. But it bothered me."

"I was sad, to come to a verdict like that. Had it been a capital case I couldn't have, I never would have voted for a conviction.

"That's why I am against capital punishment. God, if we ever make a mistake, how are we going to rectify it?" he asked.

The Examiner's report of how the two key witnesses admit to having given false or misleading testimony troubled him, Wright said.

"I'm all for law and order, but, my God, this is not law and order," he said.

"We might have law and order, but not by putting innocent people in jail," he said.

Chinatown Murder<br>
How witness<br>
was coerced<br>
By Raul Ramirez<br>
©1976 San Francisco Examiner

"I falsely testified in The People v. Richard Lee."

With this opening, Thomas Porter Jr., the man whose testimony may have sealed the murder conviction of Richard W. Lee three years ago, swears now that he lied to keep the young Chinese-American behind bars.

Porter, now a federal prisoner, claims he lied because of police threats against him and his girlfriend.

On Nov. 1, 1972, Richard Lee, then 19, a San Francisco bank teller, became the first person convicted of murder in a wave Chinatown youth gang killings.

Porter's admission that he lied as a witness, along with other information obtained by The Examiner during an investigation into the Lee case, indicates that the young man was convicted on the strength of misleading and perjured testimony.

Porter's testimony, which he now repudiates, was the cornerstone of an otherwise weak prosecution case: He testified that Lee had confessed to the murder while the two shared a cell in the San Francisco County Jail while awaiting their respective trials.

Porter's assertion that Lee had boasted of his gang connections and of how they would scare away witnesses helped explain the absence of other substantial witnesses. The jury apparently believed him.

Porter says now:

"The truth is that Richard Lee never told me any such thing, nor did he ever say anything to me or in my presence about any murder or any crime, other than to say what he was charged with by way of explaining why he was in jail," Porter declares in a sworn statement given from a federal penitentiary.

Several weeks after he met Lee at the San Francisco City Jail in July, 1972, Porter says, he was summoned by a robbery detail police officer to the department's homicide squad.

An escaper from a federal penitentiary at the time, Porter faced kidnaping, robbery and assault charges in connection with an abduction of a San Francisco taxicab driver.

The officer and others alluded to additional charges that could be filed against Porter, then talked about Richard Lee, Porter claims in his affidavit.

"They said they knew he was in the same tank as I was and that they had purposely had me and him put in the same tank because they wanted information from Lee," Porter says. "They said they wanted something to convict Lee of murdering a Chinese man . . ."

Lee was awaiting trial on charges that he had killed a 22-year-old Chinese man in retaliation for the attempted kidnaping of the brother of a gang boss.

After the initial meeting, Porter said, he was taken to several session with Pierre Merle, the assistant district attorney prosecuting Lee, and with police homicide inspectors.

"When I first met with Merle he gave me a written story that he told me to learn so that I could give it as testimony against Richard Lee," he said. "Mr. Merle had me recite the story for him over and over and he told me how I should testify. Mr. Merle always took the written story back from me at the end of the meetings.

"My lawyer, Cyril Weeks of the public defender's office, was never present for these meetings, but he knew of them." (Weeks, in a recent interview, said he remembered little about Porter's case, but recalled knowing that Porter held several meetings with police officials.)

Porter adds: "I agreed to give the false story that Pierre Merle gave me at Richard Lee's trial because of threats and promises made to me by Officer (police homicide inspector Frank) McCoy and his partner. They repeatedly promised me that if I gave the story prepared for me . . . I would not have to serve any time in California.

"They promised me that the woman I loved . . . who, pregnant, was being held in jail on the same charges . . . would be set free after a brief period of observation.

"When I refused to go along with the story that had been prepared for me to give as testimony . . . despite the promises . . . Officer McCoy and his partner, a blond man, 29-30 years old, of medium build, threatened me with bodily harm and death. McCoy and his partner took me on an elevator not far from homicide and McCoy's partner drew his revolver and said that I would testify or my people would never see me again . . . McCoy's partner then hit me behind and below my ear, causing it to swell but leaving no mark.

"I did not agree to give the false testimony that had been made up for me against Richard Lee until my life was threatened . . ."

\* \* \*

Former prosecutor Merle did not respond to telephone requests from The Examiner to discuss the Lee case. McCoy declined to discuss the case because, he said, it was decided by a jury "before a competent judge." He suggested that allegations of misconduct, if any, be taken to the district attorney's office.

Dist. Atty. Joseph Freitas, apprised of the content of Examiner stories concerning the case, said he would review his office files and promised to cooperate fully in a judicial review. San Francisco attorney Roger Ruffin, a former San Diego Superior Court judge who now represents Lee, says he will soon seek such a review.

\* \* \*

Not long after Lee's conviction, Porter was convicted of armed robbery in San Francisco. He was sentenced to five years to life after authorities noted that he had cooperated in Lee's case. His term was to run concurrent with his federal sentences for auto theft and escape.

Porter's girlfriend was released on parole and later disappeared in violation of the terms of her release. She is now a fugitive.

Porter was later transferred to a federal penitentiary in the Midwest, where he is now is imprisoned. But the Lee case remained in the back of his mind, he says, as a troublesome recollection.

Early last year, in the course of checking with the principals in the Lee case, The Examiner contacted Porter in prison. He welcomed this as his first opportunity since Lee's trial to tell the story behind his testimony.

Later, an attorney volunteered to take an affidavit from Porter. The above statements were quoted from that document.

\* \* \*

Through the entire trial ordeal, Lee had protested that he was innocent. The night of the murder, he told The Examiner, he had eaten dinner at an apartment he shared with a friend in the Sunset District, then joined others to attend a friend's graduation from Opportunity High School at the Lowell High School auditorium.

After the ceremony, he says, he drove to a house in the Ingleside District into which he and friends were in the process of moving, watched the others play cards for a while, then retired to sleep

In separate interviews, the youngsters whom Lee cited as his companions that night confirmed his account. ·

This alibi was never presented to the jury. Lee's attorney, Patrick Coyle, told The Examiner he had asked a friend of Lee to contact witnesses and ask them to get in touch with him but that this was never done. Coyle says he felt that the testimony of teenagers, many of whom had been labeled by police as gangsters, would have done little to sway the jury.

Lee's defense was hampered by another factor. Coyle did not find out about Porter's role as a witness until after the trial was under way.

The attorney protested to the judge that he did not have time to check Porter's background and reliability, but was turned down by the jurist when he sought a postponement.

* * *

In earlier reports, The Examiner detailed how the sole "identification" witness who testified that Lee was Leong's killer had sought to tell police that she was not sure that the gunman was indeed Lee.

That witness swears she was told by police that 11 other persons had identified Lee. Not until after the trial, she says, did she learn hers was the only "identification" of Lee as the killer.

The Examiner also has located another young man identified as being at the Ping Yuen public housing project when Leong was gunned down. That young man, once sought by police as an accomplice in the killing, says he walked upon the incident by chance. He affirms that the killer was not Richard Lee.

Still another law enforcement barrage against Richard Lee was delivered through senior probation officer Richard Silva.

Silva prepared a report recommending that Lee be sent to prison for the maximum term.

* * *

After being processed through California's prison intake system, Lee was assigned to Deuel Vocational Institution, the medium security prison in Tracy.

While appeals of his conviction prepared by volunteer lawyers have winded their way through the court maze, and have failed, Lee has quietly bided his time. He is currently enrolled in vocational training courses at the prison and works in the institution's warehouse as a stock clerk. Prison authorities described his conduct as excellent.

Pierre Merle, the man who led the effort to convict him, is now an investment firm's lawyer in New York City. He left a controversial prosecutorial career here.

(Months ago, a state Bar panel recommended that sanctions be taken against Merle for alleged misconduct involving a 1973 Chinatown case. A qualified state Bar source said that a disciplinary review committee has decided to impose unspecified disciplinary action against him. State Bar officials, for the record, said that there has been no official action taken concerning Merle.)

Says Lee, from the prison compound:

"The way I see it, they put me here according to their law of the land. I can't fight it because they've got me in a situation where if you fight it, they'll just get you more, lock you up, charge you . . .

"I have resigned myself right now to being here."

Despite a feeling that he was wronged by a legal system seeking scapegoats, Lee says he remains strong in spirit:

"They've got my body in here. Physically, they've got me but my mind is still free. As long as my mind can still function freely and think what I want to think and feel what I want to feel, it's OK. I'll make it."

## APPENDIX D

### AFFIDAVIT OF THOMAS HENRY PORTER, JR.

Thomas Henry Porter, Jr., upon his oath, attests:

1. At times I have used the alias John Henry.

2. I am a prisoner at the Terre Haute Federal Penitentiary Department of Prisons #36168-115, and I am serving a sentence of 0-6 years for interstate transportation of a stolen vehicle imposed by the Eastern District of Missouri. I am under a detainer from the State of California for a sentence of 5-life for armed robbery. I am under a sentence from the District of Kansas for 2 years for escape.

3. On October 30, 1972 I testified in the case of People v. Richard Lee being tried before Judge Ertola in Superior Court, San Francisco, California.

4. Some of my testimony in the trial of Richard Lee on October 30, 1972 was not true and I knew it was not true when I gave it. I gave false testimony in Richard Lee's trial because my life had been threatened by officers of the San Francisco Police Department while I was a prisoner in their custody and because promises were made to me by those officers and by the district attorney's office in San Francisco that in exchange for my false testimony against Richard Lee, I and the woman I loved would receive light treatment on the serious charges then pending against both the woman and myself, as I shall explain further in this affidavit.

5. I testified falsely in People v. Richard Lee that I spent my childhood in Chicago, that I lived on the Southside of Chicago, that I spent 2-3 years in the Chicago area, that I traveled from the Southside of Chicago to Chinatown there often to learn the art of self-defense, that I worked with a fellow who hauled trash in Chicago, that I stayed in Chicago for as long as 8-9 months, that I went from Kansas City to Chicago when I was 16 and have been going back and forth from Kansas City to Chicago, that I used to mow lawns and stuff in Chicago, and that I learned Swahili from people from the Virgin Islands in Chicago. The truth is that I have never been in Chicago in my life.

6. I testified falsely in People v. Richard Lee that I could speak

Cantonese and that I can understand Cantonese. The truth is that I have never been able to speak or understand Cantonese.

7. I testified falsely in People v. Richard Lee that Richard Lee told me that he did not know if he was going to be convicted of anything; that he was not sure whether he would be convicted because he did not feel that a girl that the People were trying to get to testify would testify for the People because his gang members had talked to her and his people; that Richard Lee told me whether or not he had committed the murder with which he was charged; that I had other conversations about the murder with Richard Lee after we were bound over; that he was surprised that the girl testified; that he was surprised that the girl testified because of the threats issued to the girl and her family if she was to testify and that he would come back on appeal after and something would happen to her; that Richard Lee told me how he committed the crime; that Richard Lee told me that he was in Chinatown, around Pacific Street, that the guy was on the telephone, and that he killed this dude for the reason he had got in an argument with his gang members; that Richard Lee mentioned the guy on the telephone; that Richard Lee told me that he just shot the guy while he was talking on the telephone; that Richard Lee told me why he was the one who killed this man—because he was wishing there was more fellows in the gang, but he felt as though they were afraid and not qualified to pull the trigger, so that Richard Lee was appointed as the one to kill this man; that Richard Lee mentioned Kit Fong in reference to who appointed him. The truth is that Richard Lee never told me any such things, nor did he ever say anything to me or in my presence about any murder or any crime, other than to say what he was charged with by way of explaining why he was in jail. Richard Lee wrote Kit Fong's name on an envelope and he told me that I could reach him, Richard Lee, through Kit Fong, if I wished.

8. I falsely testified in People v. Richard Lee that Richard Lee had occasion to talk to me about any organization to which he belonged; that Richard Lee told me he was a member of the Ching Wah Yee Gang, that the gang extorted people up and down Chinatown, and that he could shoot a person in Chinatown; that Richard Lee told me how this gang operated, what they did, and what they could do; that Richard Lee told me that he could pull the trigger and kill

somebody in Chinatown and he would not get sent to the penitentiary for it because nobody would testify against him because of fear that something may happen. The truth is that Richard Lee never told me any such things and he never told me anything about any organization that he belonged to.

9. I falsely testified in People v. Richard Lee that Richard Lee had told me that a symbol in a newspaper picture of where he lived showed 2 people being arrested and that Richard Lee told me that one of the gang members lived in the house pictured or that Kit Fong lived there. What he told me was that the newspaper caption said that 2 people had been arrested there.

10. I falsely testified in People v. Richard Lee that Richard Lee told me what he did after he shot the man on Pacific Avenue on the telephone; that Richard Lee told me he buried the gun, went to his mother's house, and then went to make preparations for an attorney; that Richard Lee told him that since Richard Lee had been locked up some of his members disposed of the gun, dug it back up because it could have been seen where they buried it, and were supposed to have cut it up into different pieces and scattered it into one of these lakes; that Richard Lee had told him he had buried the gun where it could be seen. The truth is that Richard Lee never told me any such things and that he never had anything to say about his case to my knowledge.

11. I falsely testified in People v. Richard Lee that Richard Lee told me that he was not worried about his murder charge and that he felt the witness would not show up, and that Richard Lee told me that witnesses had been threatened. The truth is that Richard Lee never told me any such things and that he never talked about his case to my knowledge.

12. While I was in the county jail in San Francisco awaiting trial on charges of armed robbery, kidnapping, and possession of a sawed-off shotgun, approximately 3 months after I met Richard Lee in the city jail in San Francisco, I was forced to accompany Officer Casey of the robbery detail of the San Francisco Police Department to homicide. Officer Casey told me they had another robbery charge. At homicide Officer Casey and another officer of the San Francisco Police Department whose name is unknown to me began talking about Richard Lee. They said they knew he was in the same tank as I was and that had purposely had

said they wanted something to convict Lee of murdering a Chinese man whose name is unknown to me. They said Richard Lee had killed the Chinese man in a telephone booth down on Powell or Pacific Street in San Francisco. They told me the date on which the man was killed, which I cannot remember, and they told me that a gun of an unspecified type had been used to kill him. They said the gun had not been found and that it had been taken from the scene of the crime and broken into pieces into deep water. They told me to say that Richard Lee had told me he could kill anyone in Chinatown without worrying, and they told me to say that I could speak Cantonese, as I could not. At this time Richard Lee had not told me that he had killed anyone and he had not confessed any crime to me. In fact, Richard Lee would never talk about anything important and he would not talk about his case.

13. After the meeting with Officer Casey and the other officer at homicide I was forced to meet repeatedly, perhaps 30 times, with Pierre Merle of the district attorney's office, by officers of the San Francisco Police Department. When I first met with Merle he gave me a written story that he told me to learn so that I could give it as testimony against Richard Lee. Mr. Merle had me recite the story for him over and over and he told me how I should testify. Mr. Merle always took the written story back from me at the end of our meetings. The meetings took place at homicide until I was transferred from the county jail in San Francisco to different outlying jails in the 6 weeks before Richard Lee's trial. Sometimes Officer McCoy of the homicide detail of the San Francisco Police Department or his partner, whose name is unknown to me, or both of them, would be present at my meetings with Mr. Merle. My lawyer, Cyril Weeks of the Public Defender's Office, was never present for these meetings, but he knew of them. As Richard Lee's trial neared, my recital of the written story given me by Pierre Merle was tape recorded to make sure that I knew it and could deliver it the way Mr. Merle wished.

15. I agreed to give the false story that Pierre Merle gave me at Richard Lee's trial because of threats and promises made to me by Officer McCoy and his partner. They repeatedly promised me that if I gave the story prepared for me at Richard Lee's trial I would not have to serve any time in California on the

would not detain me when I had completed my federal sentences from which I had fled. They promised me that the woman I loved, Sybil Kenney, who had been arrested with me and who, pregnant, was being held in jail on the same charges as had been laid against me, would be set free after a brief period of observation and would not have to serve any time. When I refused to go along with the story that had been prepared for me to give as testimony against Richard Lee despite the promises that things would be much easier for me and Sybil Kenney, Officer McCoy and his partner, a blond man, 29-30 years old, of medium build, threatened me with bodily harm and death. McCoy and his partner took me on an elevator not far from homicide and McCoy's partner drew his revolver and said that I would testify or my people would never see me again, that it was election time and they needed a conviction. McCoy's partner then hit me behind and below my ear, causing it to swe.1 but leaving no mark. At the same time McCoy's partner kicked me in the tail, which had a cyst on it, causing it to swell and bleed, and afterwards I could hardly walk for 2-3 days. I was treated for the kick at the county jail hospital. During this same time I became aware that Sybil Kenney was being abused in jail, as by being thrown in the hole when she was pregnant.

16. I was promised by Officer McCoy and by Pierre Merle that I would serve no time in California on state charges and that I would be given a float out of California and would not have to come back there. Pierre Merle said that he had talked to people in Sacramento and that I would not have to come back to California. I received a letter from my public defender, Cyril Weeks, telling me that he had been present with Pierre Merle, Officer McCoy, and McCoy's partner when Pierre Merle had called Sacramento. Officer McCoy promised me enough money to make Sybil Kenney's bond, which I believe was $35,000.

17. I did not agree to give the false testimony that had been made up for me against Richard Lee until my life was threatened by Officer McCoy and his partner.

18. I was threatened by Pierre Merle with charges of robberies that he knew I had not committed.

19. When I testified against Richard Lee on October 30, 1972, I had no

trust in the law, and I believe to this day that if I had not testified, falsely against Richard Lee 'as I was told by the police officers and the prosecutor to testify, I would not be alive today.

20. On the day I testified against Richard Lee, October 30, 1972, before I testified, I was told by my public defender, Cyril Weeks, that no detainer would be placed on me by California.

21. I met with Pierre Merle on the day I testified against Richard Lee, October 30, 1972, for 2-3 hours. Just after I testified I met with Pierre Merle at homicide in the presence of Officer McCoy and his partner, when Pierre Merle told me that I had forgotten to testify that Richard Lee considered himself extremely dangerous and hoped to be head of the Wah Chang Gang, and that if he did he would control Chinatown. Pierre Merle told me that I had testified well.

22. About a week after I testified against Richard Lee, I and Sybil Kenney were tried and convicted in Superior Court, San Francisco, I of first degree robbery and she of second degree robbery. I was sentenced to 5-life to run concurrent with the federal sentences I have mentioned, and Sybil Kenney was sentenced to 1-life. Sybil Kenney was not released after brief observation. Thus none of the promises that were made to me by the People in exchange for my false testimony against Richard Lee were kept. The detainer from California still hangs over me.

So I betroth.

Date: _7-23-75_ _Thomas Henry Porter Jr._
 Thomas Henry Porter, Jr.

Thomas Henry Porter, Jr., subscribed the foregoing affidavit of 6 pages after reading each page and making any corrections he desired and after signing each page in the margin and initialing each correction, before me at Terre Haute Federal Penitentiary, in the State of Indiana, on July 23, 1975.

_Alice M. Manning_
Alice M. Manning, Notary Public, Indiana
My Commission Expires January 13, 1979